2 Ill. App.3d 392 (1971)
276 N.E.2d 446
BERNARD KLIBANOW & COMPANY, INC., Plaintiff-Appellee,
v.
ERWIN SHAFER, et al., Defendants-Appellants.
No. 54139.
Illinois Appellate Court  First District.
November 4, 1971.
*393 *394 Lewis W. Schlifkin and Edward A. Berman, of Chicago, for appellant.
Solomon Gutstein and Ronald S. Cope, of Chicago, for appellee.
Judgment affirmed.
Mr. JUSTICE DEMPSEY delivered the opinion of the court:
The defendants, controlling beneficiaries under a land trust, appeal from a judgment for $7,500 entered in favor of the plaintiff, a real estate broker.
The defendants' main contentions are that the plaintiff did not produce a purchaser who was ready, willing and able to buy their property on their terms, and that the trial court erred in refusing to admit parol evidence to explain ambiguous statements in two documents introduced into evidence by the plaintiff.
With the exception of William Levin, the plaintiff's salesman, all the principals to the transaction were lawyers. The three defendants, Erwin Shafer, Arthur Bogeaus and Walter Sampson were members of the Illinois bar and the prospective purchaser, Gerald Kaufman, was a member of the bar of the State of New York. At times, Kaufman was represented by Martin Gordon, a Chicago attorney.
Levin and the defendants began discussing the sale of the property in 1961 or 1962. From time to time he showed it to potential buyers. In the summer of 1965 he submitted the property to Kaufman who was engaged in the hotel business in Chicago; Kaufman was interested and Levin arranged for him to meet the defendants. At this meeting further details were supplied, a price of $770,000 to $775,000 was quoted and Kaufman said he wanted to buy the property. He was unfamiliar with Illinois land trusts and a second meeting was arranged to give him an opportunity to check into the legal aspects of such trusts. The principals met again on August 19, 1965, in the land trust department of the Chicago Title and Trust Company, Chicago. On August 20th they returned to the Title Company where an escrow agreement was drawn and executed. The agreement was signed by Shafer in behalf of the beneficiaries and by Gordon in behalf of Kaufman. No question is raised as to Gordon's authority.
The agreement, entitled "Escrow Instructions," was on a standard printed form customarily furnished by the Title Company. Inserted into the form were typewritten provisions which stated that Shafer would *395 deposit with the Title Company a trustee's deed conveying the property to Kaufman; that Kaufman would deposit $10,000 and would, on or before October 1, 1965, deposit an additional $140,000 and a second part purchase money mortgage and note payable on or before March 1, 1966, in the amount of $118,837.62. Further typed provisions were for the issuance of a $772,000 title insurance policy; the purchase of $295.90 in revenue stamps to be affixed to the trustee's deed, and the payment by the escrowee of $7,500 to the plaintiff as brokerage commission.
The agreement was entered into on a Friday afternoon and Kaufman promised to make his initial $10,000 deposit the following Monday morning, August 23rd. The defendants acquiesced and the agreement was signed. When the group left the offices of the Title Company, Shafer said to Levin, "Well, Bill, we finally made it, the deal, congratulations. You have earned a commission at last."
The commission was never paid. On August 23rd Kaufman telephoned Levin and informed him of a telephone call he received that morning from Shafer. Levin testified that he then called Shafer and repeated what Kaufman had said: that Shafer told Kaufman not to deposit the $10,000. When Levin asked why he did this Shafer replied the deal was not satisfactory to him and would be cancelled unless changes were made in conformity with his wishes. Arrangements were made for another meeting.
At this meeting the defendants, according to Levin's testimony, insisted that the escrow agreement be altered. They refused to prorate as of October 1, 1965, and because of tax considerations wanted to change the payment dates set out in the agreement. Kaufman would not consent to the proposed changes and the deal fell through.
Kaufman, who was called as a witness by both the plaintiff and the defendants, testified that he did not deposit the $10,000 because of a conversation he had with one of the defendants on August 23rd; in this conversation it was mutually agreed "to abandon the deal for one reason or another." He testified that it was his intention to close the deal on August 20th. Conversely, he testified that he was not ready, willing and able to close the deal on that date. He also stated that he was willing to close but his ability to do so rested on either raising the money or getting a new first mortgage of $656,000 or $657,000. Contrariwise, he stated that the total purchase price consisted of the existing first mortgage [$525,000] plus the sums called for in the escrow agreement: $10,000, $140,000 and $118,837.62.
Shafer testified as the plaintiff's witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1967, ch. 110) and he also testified in his own behalf. He said the escrow agreement was intended to be a memorandum *396 of the offer made by the owners of the property and that Levin knew it was only an offer. He conceded that Kaufman was ready and willing to purchase the property and was sufficiently solvent to do so. He affirmed saying in his discovery deposition that Kaufman had "tremendous resources" and could, if he wanted to, pay for the property in cash out of his own pocket.
The defendants' attorney asked Kaufman and Shafer questions concerning the financial details of the purchase, the size of the contemplated first mortgage, their understanding of the escrow agreement, and their conversations with Levin about these subjects. Objections to the questions were sustained. The court ruled that the agreement of August 20th was a contract and that a written contract could not be modified or explained by parol evidence. An offer of proof was made that Kaufman, if permitted to answer the questions, would testify that: at a meeting held in his office subsequent to August 23rd he told the defendants, in the presence of Levin, of his and Levin's attempt to obtain a $650,000 mortgage and their failure to do so because the sale price was $772,000 and that the defendants were requested to obtain a $650,000 mortgage (based on their cost price of $900,000) and to execute it individually but they refused. Another offer of proof was made that Shafer would testify Levin informed him of the problem he was having in getting a $650,000 mortgage for Kaufman and told him a condition to the completion of the transaction was for the three beneficial interest holders to personally execute a first mortgage; Shafer advised Levin that under no circumstances would this be done.
 1, 2 A real estate broker ordinarily earns his commission by producing a buyer who is ready, willing and able to purchase the property on the seller's terms. (Nardi, Pain & Podolsky v. Vignola Furniture Co. (1967), 80 Ill. App.2d 220, 224 N.E.2d 649.) This is true even though the seller refuses to contract with the buyer. 12 Am.Jur.2d, Brokers, sec. 183. When the seller approves the buyer or enters into a contract with him, his readiness, willingness and ability are no longer open to question and the broker's right to compensation accrues whether or not the sale is completed. Greenwald v. Marcus (1954), 3 Ill. App.2d 495, 123 N.E.2d 139.
The defendants argue that they had no binding contract with Kaufman; that the escrow agreement was conditional and was directive to the escrowee; that the failure of Kaufman to deposit the $10,000 indicated that he did not accept the terms and conditions they attached to the sale and was not ready, willing and able to complete the purchase.
 3-6 This argument overlooks Shafer's testimony that there was no *397 doubt as to Kaufman's solvency, willingness and ability to purchase the property, Kaufman's testimony that he intended to make the purchase and Levin's testimony, undenied by Kaufman, that it was Shafer who asked Kaufman not to make the deposit. Although the escrow embodied instructions to the escrowee, it also comprised an agreement between the sellers and the purchaser; it included the consideration for the transfer of the property, the mutual promises of the parties, the details of their transaction and their signatures. No particular form of instrument or of words is necessary to create a valid written contract for the sale of land. Escrow instructions, containing all the necessary elements of a contract and signed by the seller and the buyer, can be, in the absence of any superseding written instrument, the contract of the parties. (Tuso v. Green (1924), 194 Cal. 574, 229 P. 327; Twisselmann v. Cohen (1943), 57 Cal. App.2d 987, 136 P.2d 33; Williams v. Rush (1933), 134 Cal. App. 554, 25 P.2d 888.) In the present case there was no superseding instrument covering the sale of the property. Shafer testified that no other written agreement was entered into by the defendants and Kaufman.
The escrow agreement did not mention a first mortgage; this, and the following language in the agreement, constitute the basis for the argument that the agreement was conditional:
"4. Mortgage encumbrance(s) recorded as document(s) as you are advised in writing by the undersigned."
Number 4. was but one of seven conditions, such as taxes and judgments, to which issuance of the title insurance policy was subject. The clause does not state that obtaining a mortgage in a certain amount was a condition precedent to the agreement between the parties and it cannot be so construed. Even if the defendants' offers of proof are accepted at their face value, they refer to proposals advanced during the renegotiations of the parties more than a week after the agreement was signed and a week after the agreement was discarded.
More persuasive than the offers of proof, or the fluctuating testimony of Kaufman as to whether he was to assume the existing first mortgage or had to obtain new financing before the agreement became final, are the figures in the agreement itself. The agreement provided for $295.90 in revenue stamps. The plaintiff points out that under the prevailing law no revenue stamps were required for that portion of the purchase price represented by an existing mortgage. $295.90 in stamps equaled the requirement (55 cents in stamps for each $500 or fraction thereof) for the cash payments called for by the agreement: $10,000; $140,000 and $118,837.62. If a new mortgage were contemplated at the time the agreement was signed either the cash payments or the allocation for revenue *398 stamps would have had to be revised and there was no provision for this to be done.
It is not unnatural for a buyer to seek as large a mortgage as he can and this may have been Kaufman's desire. But if the parties  all lawyers  intended the successful acquisition of a mortgage in excess of the existing one to be a prior condition to the performance of their obligations their contract should have so provided. Kaufman's desire to secure a larger mortgage does not establish his unwillingness to accept the existing one in the event his desire could not be fulfilled.
 7 The defendants' argument that the plaintiff is not entitled to a commission is also predicated on the provision in the escrow agreement that the escrowee would pay the plaintiff $7,500 as brokerage commission, and on a letter, prepared by Shafer and signed by Levin, sent to the Title Company on August 18, 1965. The letter referred to the proposed sale of the property to Kaufman for an agreed price of $771,491.80 and stated that the plaintiff's commission would be $15,000, one-half of which was to be paid on or before October 1, 1965, and the balance on March 1, 1966, in the event the transaction was consummated. The letter provided further that if the transaction was not consummated the plaintiff was to retain that part of the commission which had been received but would not be entitled to further commission. The essence of the argument is that the first half of the commission was to have come from the $10,000 deposit of the purchaser and since this money was not deposited no commission was payable. The letter said nothing about the commission being paid out of the initial deposit. The escrow agreement implied this but the plaintiff was not a party to that agreement and was not bound by it.
 8 The case was tried without a jury and the trial court had to determine the preponderance of the evidence and the credibility of the witnesses. The decision of the court in favor of the plaintiff was not contrary to the weight of the evidence.
The defendants also urge reversal because the court refused to permit them to explain three ambiguous items of evidence. The first of these is the August 18th letter. The letter was unambiguous and needed no oral explanation. The second is the provision in the agreement which we have already discussed: "4. Mortgage encumbrance(s) recorded as document(s) as you are advised in writing by the undersigned." The provision was not ambiguous. Supplying information to the escrowee about the mortgage was a condition to the issuance of its title policy. The clause pertained to the escrowee not to the agreement of the parties. The court did not err in sustaining objections to the attempted explanation.
The third item about which the defendants complain was also in the agreement. Following a number of typewritten directions to the escrowee *399 regarding deliveries, charges and payments it was to make, the escrowee was told in the printed portion of the instrument:
"You are not to pay charges * * * which were incurred prior to this escrow. The parties have heretofore entered into an agreement for the sale of the premises herein."
The defendants attach great importance to the last sentence; they argue that it shows there was a separate agreement with Kaufman and that the terms and conditions of this agreement were requisite to a full understanding of the written agreement and a correct decision whether the latter constituted an enforcible contract.
 9-11 In the normal order of things, parties to a real estate transaction have some understanding before they arrange for an escrow. The printed statement in the standard form, "The parties have heretofore entered into an agreement" gives recognition to this fact. Beyond this, the statement has little significance. Of necessity, there was a preliminary understanding between the defendants and Kaufman before they went to the Title Company and formalized their agreement. However, all words in a contract  printed, typed or handwritten  must be given consideration. If a written contract makes reference to an antecedent or contemporaneous oral agreement, the agreement may be shown if it is not inconsistent with the written one. (Dillow v. Hileman (1939), 300 Ill. App. 509, 21 N.E.2d 632.) The oral agreement must not be inconsistent with the written one because all prior agreements, understandings and negotiations are deemed merged in the final written contract and it is not permissible to modify or abrogate its terms by parol evidence. Although the rulings of the court were unnecessarily restrictive, they were not illfounded. A scrutiny of the record, the offers of proof and the arguments of counsel lead to the conclusion that the defendants' purpose in offering parol evidence of an alleged oral understanding was to vary the import of the written agreement. Neither the individual nor the cumulative rulings of the court on the three evidentiary items constitute reversible error.
 12 The defendants engaged the plaintiff to sell their property. After much effort a purchaser was produced who was more than interested  he wanted the property. He was a man of means who was not only able but willing and ready to buy. Negotiations resulted in his accepting the defendants' terms. At this juncture the plaintiff had completed its undertaking and its right to a commission had accrued. The contract between the defendants and the purchaser confirmed this right and the failure to carry out or enforce the contract did not lessen it. Whether Shafer telephoned Kaufman not to make the first deposit, or whether in that conversation they mutually agreed to terminate their understanding is not *400 of crucial importance. In either event, the defendants, having released Kaufman from his obligations, cannot evade their liability to the plaintiff. The plaintiff earned and is entitled to its commission.
The judgment is affirmed.
Judgment affirmed.
McNAMARA, P.J., and McGLOON, J., concur.