Donald E. PAYNE,
Plaintiff-Counterdefendant,

v.

AHFI/NETHERLANDS, B. V., et al.,
Defendants-Counterclaimants,

v.

David M. EDWARDS, et al., Additional
Counterdefendants.

No. 79 C 1108.

United States District Court,
N. D. Illinois, E. D.

Nov. 12, 1980.

I. Peter Polansky, Baum, Sigman & Gold Ltd., Chicago, Ill., for plaintiff-counterdefendant.

Gary Elden, Philip Stahl, Mark Sableman, Reuben & Proctor, Chicago, Ill., for defendants-counter-claimants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This action involves (1) claims by plaintiff Donald E. Payne ("Payne") charging breach of contract and fraud by defendants American Hospital Supply Corporation ("American") and AHFI/Netherlands, B. V. ("AHFI") relating to Payne's now-terminated employment relationship with defendants and (2) counterclaims by defendants against Payne and additional counter-defendants Daniel C. Lee ("Lee") and David M. Edwards ("Edwards") charging conspiracy, extortion, conversion and breach of fiduciary duties. Defendants have moved for summary judgment on Payne's complaint. For the reasons stated in this memorandum opinion and order, defendants' motion for summary judgment is granted.

### Facts [1]

On October 1, 1975 Payne was hired by the predecessor of AHFI, which is a wholly-owned subsidiary of American. Initially Payne was to work for AHFI on a project in Saudi Arabia. Though he commenced work there, the position for which he had been hired was terminated, and he was reassigned with his consent to AHFI headquarters in Illinois.

In early 1976 Payne was reassigned to the Korean team of the Seoul National University Hospital ("SNUH") equipping project. On that project his duties were to coordinate distribution of catalogues and handle correspondence relating to mechanical, electrical and architectural equipment.

Edwards and Lee were hired by AHFI in January and February 1976 to work on the SNUH project. Edwards served as director of the Korean-based AHFI team and Lee as a coordinator for architectural changes. After brief trips to Korea in early 1976, Payne, Edwards and Lee moved there permanently in about August 1976.

Payne's original assignment to the Saudi Arabian project was evidenced by an October 1, 1975 letter from AHFI executive Vansant. Among other provisions, the letter set Payne's salary "at an annual rate of [10,000£] ($20,850)" and stated that AHFI would pay Payne's airfare home "[i]n the unlikely event of termination of your employment with us." When Payne was reassigned to the Korean project a 20-page document captioned "Expatriate Foreign Assignment" was executed by AHFI and delivered to Payne in about June 1976. As Payne's memorandum in opposition to defendants' motion states:

> This document sets forth all the pertinent terms and conditions of Payne's employment on the Korean assignment and describes the term of said assignment.

In the latter respect the "Expatriate Foreign Assignment" ("EFA") document stated:

> It is expected that the employee will remain in the foreign post for duration of project which is expected to be approximately two (2) years. In some cases because of certain circumstances the EFA may be shorter or longer. There are many factors that would cause a shortening or lengthening of the EFA such as individual performance, economic conditions, foreign or domestic, AHFI's business plans, etc.

In addition the EFA document stated:

> Donald E. Payne's employment arrangement will be in compliance with the labor laws of thw (sic) State of Illinois and subject to all of that State's laws and regulations in all disputes arising out of this employment arrangement.

---

1. Essentially all the facts stated in this opinion are taken from Payne's own deposition. Accordingly the test under Fed.R.Civ.P. 56, of taking all facts and all reasonable inferences therefrom in the light most favorable to the party opposing summary judgment (Payne), is plainly satisfied.

Payne claims that before delivery of the EFA document his conversations with Vansant dealt with the terms of his employment, including a statement that the SNUH project would last not less than two years. At his deposition Payne was asked "whether Mr. Vansant phrased what he said about two years in terms of a prediction or in terms of a promise." Payne replied, "I cannot remember exactly what he said." Upon further questioning Payne said, "Corwin Vansant stated that in his opinion the project would be not less than two years and he never indicated to me that I would be required for a less period than that." Payne could remember no more about what he characterizes as the "oral promise" by Vansant. Vansant's memorandum of his conversations with Payne, which Payne admitted covered the "essence" of the talks, mentions termination as one of Payne's options but does not mention any specific term of employment.

Although the SNUH project in fact lasted more than two years, Payne was terminated as of September 30, 1977, exactly two years after he was hired by AHFI. We turn then to the circumstances leading to termination.

Before any of Payne, Edwards and Lee had been hired, American issued a corporate policy on August 15, 1975 (the "1975 Policy") prohibiting contributions or gifts to governmental officials, candidates or political party officials. In late December 1976, after all three had been employed, American entered into a consent decree (the "Consent Decree") with the SEC in which American, while not admitting allegations that it had made illegal foreign payments, agreed to take stringent steps to see that no such payments occurred in the future. As part of the Consent Decree, American agreed to "institute and maintain enforcement and control measures to assure compliance" with the Consent Decree and its new Business Ethics Code of Conduct (the "1976 Code"), which embodied and added to the 1975 Policy. Under the 1975 Policy and the 1976 Code, American asked managerial employees, including those working for its controlled subsidiaries such as AHFI, to sign "certificates of compliance" and to note on them, where appropriate, exceptions to complete compliance.

Edwards and Lee signed certificates of compliance in mid-1976. Payne was not asked to sign a certificate at that time.

During January 1977 Edwards, as SNUH project director, held a meeting for Payne, Lee and all other members of the Korean project team to distribute, discuss and explain the Consent Decree and 1976 Code. Payne received copies of both and understood that he and other AHFI employees were covered by the Consent Decree, that violations of that Decree were violations of law and that a violation of the 1976 Code would be a violation of the Consent Decree. Payne read the provisions of the 1976 Code that appropriate AHFI employees would periodically be required to certify compliance, as well as the portion that required employees to report knowledge of any violations of the Code to their superiors (and Payne understood that provision to apply to him).

During January and February 1977 Payne and Edwards told American and AHFI officials about rumors of improper payments in connection with the SNUH project. As soon as those were reported, Edwards and Payne were flown to Illinois to be questioned by company officials and attorneys on the matter. They were encouraged to report specific evidence of wrongdoing to American's audit committee and special counsel.

In June-August 1977 Payne, Edwards and Lee were asked to sign the annual certificates of compliance. They considered the matter for a while and then refused, instead sending a telex to defendants demanding more than $375,000 in return for their silence on undisclosed matters involving alleged wrongdoing by defendants. At meetings in September 1977 they again refused to sign the certificates, even though they were told and admittedly understood that they could state as "exceptions" to the certificate any suspicion or knowledge of wrongdoing. They also refused suggestions

by defendants that they go to governmental authorities with their claimed knowledge. Those refusals resulted in disputes, refusals to cooperate and finally termination of Payne, Edwards and Lee effective September 30, 1977.

### Payne's Employment Contract

As to Payne's *written* employment contract, the startlingly similar case of *Buian v. J. L. Jacobs & Co.*, 428 F.2d 531 (7th Cir. 1970) is completely controlling. In *Buian* the corporate defendant had also hired an employee for an overseas job and sent him a letter stating the terms of employment. For convenience the duration language of the *Buian* letter and Payne's EFA document are juxtaposed below:

| Buian | Payne |
|---|---|
| It is scheduled that your assignment in Saudi Arabia will continue for a period of eighteen (18) months. | It is expected that the employee will remain in the foreign post for the duration of the project which is expected to be approximately two (2) years. |

Similarly, where the EFA document referred to "many factors that would cause a shortening or lengthening of the EFA such as individual performance, economic conditions, foreign or domestic, AHFI's business plans, etc.," the *Buian* letter stated that the employment abroad was subject to contingencies such as satisfactory service by the employee, good business conditions and no interruption of the foreign projects.

In *Buian* our Court of Appeals found it "clear on its face that [the agreement] does not guarantee any specific term of employment" (428 F.2d at 533), so that the agreement was held terminable *at will* under Illinois law. It held that the phrase stating that the employment was scheduled to last for eighteen months was "merely one of expectation and not sufficient to insert any ambiguity into an otherwise customary employment relationship terminable at will" (id.). Indeed the parallel is made even more striking by the specific use in Payne's agreement of the term "expected," tracking even more directly with the *Buian* concept of "expectation" as negating a binding contract for a term certain.

Accordingly, as in *Buian* this Court is obligated to hold that Payne's employment relationship under Illinois law (specifically made controlling by the EFA document) was *at will* and therefore freely terminable by defendants. That conclusion is not changed by the original letter's reference to an "annual rate" of pay, *Atwood v. Curtiss Candy Co.*, 22 Ill.App.2d 369, 161 N.E.2d 355, 357 (1st Dist. 1959), and the doctrine of *ejusdem generis* does not apply to the specific factors referred to in the EFA document any more than it did in *Buian.* Moreover, this Court's conclusion is buttressed by Payne's own statement that *he* had the right to quit before two years were up, a factor that *Buian* found would raise serious questions of mutuality if the employer's obligation were read differently (428 F.2d at 533).

As for the claimed parol variation or supplementation of Payne's contract by his conversations with Vansant, Payne must fail on four separate grounds, any one of which (with the possible exception of the first) independently defeats Payne's claim:

1. As a matter of proof, Payne himself was indefinite. When asked whether Vansant had promised him employment for two years or had merely predicted that the project would last two years, Payne said, "I can't answer it.... I cannot remember exactly what he said." Finally Payne said, "Vansant stated that in his opinion the project would not be less than two years." Thus on Payne's own version of the facts there was no oral promise that would enlarge the mere statement of "expectation" contained in the EFA document.

2. Even if Fed.R.Civ.P. 56 requirements were stretched to give Payne the benefit of *unreasonable* inferences from his own admission that there had been no *promise* by Vansant, the lack of mutuality of the claimed promise would make the alleged contract illusory and non-enforceable. Payne's own account of *his* undertaking was that he had simply agreed to work for AHFI as long as he wanted to. In *Meadows v. Radio Industries, Inc.*, 222 F.2d 347,

348 (7th Cir. 1955), our Court of Appeals applied Illinois law to hold a claimed employment contract void for lack of mutuality when there was "not the slightest bit of evidence that plaintiff ever agreed that he would continue in the employment of defendant for any specified time." *Buian*, 428 F.2d at 533, is in accord as to the unenforceability of such an alleged agreement so lacking in mutuality.

3. Because the claimed oral statements by Vansant *antedated* the EFA document, and because that document is plainly an integrated writing embodying all the terms of Payne's employment, the oral statements cannot be used to modify the terms of the EFA document. *Bernard Klibanow & Co. v. Shafer*, 2 Ill.App.3d 392, 276 N.E.2d 446, 451 (1971), confirming what has been the law in Illinois for over 100 years, *Orr v. Ward*, 73 Ill. 318, 319 (1874).

4. Even had Vansant orally promised to employ Payne for more than two years, that promise would be unenforceable under the Illinois Statute of Frauds, Ill.Rev.Stat. ch. 59, § 1. *Gilliland v. Allstate Ins. Co.*, 69 Ill.App.3d 630, 26 Ill.Dec. 444, 388 N.E.2d 68, 70 (1st Dist. 1970).

■ Thus neither the written documentation nor the claimed oral supplementation supports Payne's claimed cause of action on the theories he had originally asserted. In Payne's memorandum in opposition to defendants' motion, Payne has advanced for the first time another theory—essentially that AHFI owed a "duty of good faith and fair dealing" to him and breached that duty when it fired Payne. But the short and conclusive answer to that argument [2] is that whether or not *California* law (on which Payne's California lawyer relies) would support such a claim, *Illinois* law does not. *Criscione v. Sears, Roebuck & Co.*, 66 Ill. App.3d 664, 23 Ill.Dec. 455, 384 N.E.2d 91, 95 (1st Dist. 1978), rejected an employee's

claim based on an alleged bad faith termination of an at will employment contract:

> [R]equiring an employer in an at will relationship to terminate an employee only for a legitimate business reason absent any other restrictions by contract or statute would place the courts in the untenable position of having to assess an employer's business judgment. There has been no attempt by the legislature to so alter the State's employment policy and such a step is not one for the courts to make. The rule in this state is that an employment at will relationship can be terminated for "a good reason, a bad reason, or no reason at all."

*Payne's Fraud and Misrepresentation Claim*

As a matter of proper federal pleading, Payne's Complaint has difficulty satisfying the requirement of Fed.R.Civ.P. 9(b) that "the circumstances constituting fraud ... shall be stated with particularity." But on defendants' motion for summary judgment, this Court must look at the uncontroverted facts rather than such pleading defects. And on that score Payne also fails.

■ First, as to the claimed false statements regarding the term of Payne's employment, even viewed in the light most favorable to Payne they were "a promise or prognostication concerning a future happening" rather than relating "to an existing or past event." Under *Sinclair v. Sullivan Chevrolet Co.*, 31 Ill.2d 507, 202 N.E.2d 516, 518 (1964), Illinois law makes such statements non-actionable as fraud. Dealing with a claimed oral promise of employment, the Illinois Supreme Court found no reason to make an exception to the rule barring a fraud claim on a promise in a situation "where an individual is charged with having failed to comply with an oral agreement

---

2. Defendants also respond to Payne's new argument on two independent grounds. First, they say that even the California cases cited by Payne do not support his position. Second, they assert that Payne's own account of the situation is that he "was fired for refusal to sign a certificate of compliance (with or without oral or written exceptions); theft of company property; and what was perceived as an attempt to extort over $350,000 from his employer." Those responses have substantial force, but in view of the Court's holding in the text of this opinion the Court need not rule on them.

rendered unenforceable by [the Statute of Frauds]." See also *Younger v. Revelle*, 78 Ill.App.3d 1, 33 Ill.Dec. 888, 397 N.E.2d 221, 223–24 (5th Dist. 1979), rejecting statements and predictions as to the future as actionable fraud. Payne's memorandum in opposition to defendants' motion does not even address this issue and may on familiar principles be deemed to have abandoned the point, but even apart from that defendants' argument is sound.

■ Second, Payne complains of concealment of the requirement that he sign a certificate as to compliance with the 1976 Code. That complaint is not supported by Payne's own deposition. Additionally, in the context of affirmative disclosure of the Consent Decree, the 1976 Code and the certificates of compliance *confirmed by Payne himself*, no claim of fraudulent concealment can lie here. But perhaps most significant, the requirement of compliance certification is such an ordinary and reasonable business matter that its non-disclosure would be non-material and non-actionable in any case.[3] Payne's deposition confirmed that he was well aware of the prevalence of codes of conduct, comparable to American's, among large United States corporations, and he never considered the existence or nonexistence of such codes material with respect to his *prior* employers or his *subsequent* employers or prospective employers. Payne's tenuous argument that such *codes* may have been reasonable, but that a *certificate of compliance* with such codes was not, is rejected by the Court. Most important, as stated in footnote 3 Payne's whole argument in this respect is grounded on a reading of the Certificate that is at war with both its plain language and Payne's own deposition testimony.

■ Third and finally, Payne complains that he was defrauded by Vansant's statements, before Payne began work in Korea, that in Vansant's opinion the SNUH project was "clean," and was also allegedly defrauded by concealments during 1976 and early 1977 of illegal payments. But even if Payne's statements in that respect are assumed to be true (a matter vigorously contested by defendants, but taken in the light most favorable to Payne for purposes of this opinion), Payne himself states that he learned information to the contrary not later than January 1977 and that he told AHFI officials in January and March 1977 that bribes were being paid by defendants' employees. Thus on Payne's own version of the facts he learned of the alleged illegal foreign payments long before his employment with AHFI ended. Nonetheless he continued to work for AHFI until he was fired, well over six months after he first learned of the alleged illegal payments. As a matter of Illinois law, exemplified by *Eisenberg v. Goldstein*, 29 Ill.2d 617, 195 N.E.2d 184, 186–87 (1963); *cert. denied*, 377 U.S. 964, 84 S.Ct. 1645, 12 L.Ed.2d 735 (1964), that inaction by Payne defeats his claim of fraud:

> A person who has been misled by fraud or misrepresentation is required, as soon as he learns the truth, to disaffirm or abandon the transaction with all reasonable diligence... If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waives all benefit of relief from the misrepresentations.

Payne's only response is that he did not have "proof positive" of the alleged payoffs, but the *Eisenberg* decision specifically rejects that response by emphasizing that

---

**3.** Payne has sought to impose his own construction on the certificate and to regard the certificate, as so construed, as one he could not sign. This is the source of Payne's untenable argument—really the heart of his case—that AHFI required him "to execute a perjurious document." It is plain from reading the Certificate of Compliance that the document called on Payne to certify to the truth of various statements but *specifically* provided for the statement of any exceptions. AHFI so advised Payne on repeated occasions, giving Payne the opportunity to state the exceptions either in the Certificate or, if he wished, orally. Payne's refusal to sign the Certificate was therefore entirely a problem of his own creation. Payne's invalid self-created reading cannot change the certificate requirement from a reasonable to an unreasonable condition.

under comparable circumstances "there was obviously enough to make it [plaintiff's] duty to use ordinary diligence to make further investigations."

### Conclusion

It is therefore apparent that even on Payne's own version of the facts in this case he is not entitled to relief. This Court finds that there is no genuine issue as to any material fact and that American and AHFI are entitled to a judgment against Payne on Payne's Complaint as a matter of law.