**Maxine SCOTT, Plaintiff,**

v.

**SEARS, ROEBUCK AND CO., Defendant.**

No. 82 C 4737.

United States District Court, N.D. Illinois, E.D.

March 25, 1985.

Steven B. Varick, McBride, Baker & Coles, Chicago, Ill., for plaintiff.

Arthur L. Klein, Reed R. Kathrein, Arnstein, Gluck, Lehr, Barron & Milligan, Carl E. Smith, Chicago, Ill., Spero, Hayes & Hirschtick, for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Maxine Scott ("Scott") charges Sears, Roebuck and Co. ("Sears") with employment discrimination in violation of:

1. Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000e to 2000e–17 ("Title VII") and

2. the Illinois Human Rights Act (the "Act"), Ill.Rev.Stat. ch. 68, ¶¶ 1–101 to 9–102.

Scott also claims her termination by Sears violated its implied covenant of good faith and fair dealing under the employ-

ment contract between them.[1] Sears has now moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment. For the reasons stated in this memorandum opinion and order, Sears' motion is granted.

### Facts

#### 1. Scott's Position with Sears

On June 30, 1980 Scott was hired to participate in a job training course Sears was then conducting under contract with the Chicago Alliance of Business Employment and Training, Inc. Scott's wages were subsidized in part by federal Comprehensive Employment and Training Act ("CETA") funds (Pl. Proposed Findings of Fact ["Findings"] ¶¶ 3–4). Scott never entered into a written contract with Sears beyond signing her employment application form, which said she would be an at-will employee (Scott Cont. Dep. 50 and Ex. A).

After Scott completed a 12-week course in automotive mechanics, she was assigned to work in the automotive department of Sears' Orland Park store. At that time the automotive department was managed by Ernest McDowell ("McDowell"), with Joseph Sanders ("Sanders") as the shop manager (Findings ¶ 6).

Scott was assigned to the department's brake section. Except for an occasional assignment to replace tires and batteries, all her work consisted of repairing and replacing defective brake systems (Gadberry Dep. 29). Sanders assigned brake mechanic Eddie Gadberry ("Gadberry") to train Scott during her first three months at Orland Park (because Gadberry was on vacation when Scott first arrived, mechanic Dave Fraser trained her during her first few weeks) (Findings ¶ 7).

Scott's training by Fraser and Gadberry consisted of her working directly with them on their brake jobs (Gadberry Dep. 11). They would instruct her as they went along and then have her try her hand at the work (Scott Cont. Dep. 37). After three months of that in-service training, Scott was assigned her own work. When she ran into problems she would ask Gadberry and other mechanics for help (id. at 40). On at least one occasion Sanders asked Gadberry to evaluate Scott's performance (Gadberry Dep. 46).

Scott testified at her deposition that Gadberry trained her adequately (Scott Dep. 22).[2] He was basically pleasant to her, and she considered him her "friend" in the same way she considered all the mechanics her friends (Scott Dep. 22). Gadberry testified at his deposition he considered Scott a competent, although somewhat slow, mechanic (Gadberry Dep. 32–33, 88) and that he gave her a favorable evaluation when Sanders asked about her performance (Gadberry Dep. 46, 48).

#### 2. Alleged Sexual Harassment

Scott nevertheless claims Gadberry and other mechanics repeatedly sexually harassed her. Gadberry, the principal alleged harasser, supposedly "propositioned" her repeatedly (Scott Dep. 24, 29, Cont. Dep. 31). She said the other mechanics "flirted" with her (id. at 21–22, 42, 45, 56).

When pressed at her deposition about the details of Gadberry's alleged harassment, Scott clarified he had never touched her, made a lewd comment to her or explicitly asked her for sex (Scott Dep. 25–29). Scott said when she asked Gadberry for help with a brake problem, he often asked in

1. Scott's Second Amended Complaint also charged Sears had violated an express contract with her. She later withdrew that claim (Scott Mem. 11).

2. Scott's deposition testimony contradicted much of her pro se complaint in this action. Though her complaint had said she was inadequately trained, her testimony conceded the adequacy of her training (Scott Dep. 22). Similarly, her complaint asserted she had "complained about" harassment but was "ignored."

Later she admitted she had never complained to anyone about the harassment. (Id. at 48–49, 69–70, Cont. Dep. 32–33). Again, her complaint said she was told her job would be permanent, but she testified she knew she was only being considered for permanent employment (Scott Dep. 46–47). Finally, her complaint alleged she was "laid off for lack of work," but later she changed her story and claimed she was discharged because of her sex.

reply "What will I get for this?" (Scott Dep. 25).[3] Scott interprets that to be an "obvious" request for sex (*id.*). There is no indication Gadberry ever refused to help Scott for failure to get something in return.

Scott also said Gadberry would often "ask to take me out" (*id.* at 21, 24, 28). She said he was no more specific than that (*id.* at 28, 34). He did suggest taking her to the "Green Grasshopper," a restaurant in the same mall as Sears where the Sears automotive employees often gathered (*id.* at 29). Again she interprets those requests as requests for sex (*id.* at 29):

> He didn't come out and tell me he wanted sex. You don't have to come out and say you want to have sex with somebody, if you want to take them out this is what it's going to lead to.

Beyond Gadberry's alleged "propositions," Scott claimed he was generally "suggestive" or had an "attitude" (*id.* at 35–36). Again she could not specify any words or actions that were suggestive beyond an occasional wink (*id.* at 35–38). Finally, Scott testified Gadberry had once offered to "come over and give me a rubdown" (*id.* at 26), although Scott had not remembered this incident when she testified about sexual harassment at a co-worker's trial (*id.* at 26–27).

As for other mechanics, Scott claimed they were always "coming over to talk" to her (*id.* at 21–22), "trying to take me out on dates or whatever the case may be" (*id.* at 56) or flirting (*id.* at 42, 45). Here the only specific details Scott could offer are that mechanic Al Williams once made a lewd comment to her (*id.* at 41) and mechanic Winston Taylor once "hit me on my buttock" (*id.* at 44). As a result of the alleged harassment Scott found the work environment "very uncomfortable" (*id.* at 52).

Scott never complained to any supervisory personnel about any alleged sexual harassment (Scott Dep. 48–49, 69–70, Cont. Dep. 32–33). She said she just assumed they were aware of it (*id.*). She offered no evidence of their knowledge, asserting only that the men in the shop were a close-knit group and must have known what was happening (*id.*).

### 3. *Scott's Work Performance*

Sears imposes productivity requirements on its brake mechanics. They are generally expected to perform three brake jobs per day (Gadberry Dep. 35–37). Although brake mechanics are rotated in and out of tire and battery work, they receive less productivity credit for that type of work (Findings ¶ 15).

Scott claims Sanders and McDowell told her she would not be required to meet the normal quota during her first nine months (Scott Cont. Dep. 6, 10–11, 30). During that time she would not be judged on productivity, but she should try to work up to two or two-and-a-half brake jobs per day (*id.* at 6). Scott testified that by the end of the nine-month period she had achieved a rate of two brake jobs per day (Scott Dep. 49). She admits she was warned in April 1981 that she would be terminated unless she improved her productivity (Scott Cont. Dep. 46).

One reason Scott offers for failing to achieve a higher productivity rate is a shortage of work in the shop, which led to her frequent assignment to tire and battery duty. When work had to be done in a hurry, such as when customers were waiting, it was assigned to the regular male mechanics rather than to Scott (Scott Cont. Dep. 44–45).[4] Moreover, Scott claims the dispatcher discriminated against her on the basis of her sex by giving preference to the male mechanics when work was short (but she offers neither factual details nor any

---

**3.** Gadberry denies ever making such a statement to Scott (Gadberry Dep. 98–99). On the current motion, however, Scott's version must be credited.

**4.** Brake work was assigned by nonsupervisory dispatchers on a predominantly random basis. When a mechanic was finished with one job the dispatcher would give him or her the next job off the top of the work order pile (Scott Cont. Dep. 38).

evidence to support that allegation) (*id.*). Finally, Scott asserts she relied on Sanders' and McDowell's promise by failing to compete aggressively for work when it was in short supply.

### 4. *Scott's Discharge*

On June 30, 1981 the CETA subsidy of Scott's wages was terminated. On July 17, 1981 Scott was discharged along with Arlene Otis ("Otis"), the only other female mechanic and the only other mechanic in the CETA program. Scott claims McDowell said when he fired her (Scott Dep. 59):

> that he didn't want to pay a woman $7 an hour when he could get a man to do three brake jobs for that.

After Scott and Otis were fired no new employee was hired to replace them. Their work was absorbed by the remaining mechanics (Gadberry Dep. 56–57). Gadberry testified that after Scott's and Otis' departure the per-mechanic workload was just about right for the attainment of productivity quotas (*id.*).

### *Scott's Claims and Sears' Defenses*

Scott has either stated or suggested a number of alternative—and inconsistent—versions of the facts giving rise to various theories of recovery:[5]

1. Scott was fired in violation of Title VII and the Act for refusing to accede to Gadberry's propositions.

2. Sexual harassment created an abusive work environment in violation of Title VII and the Act.

3. McDowell's alleged comment to Scott indicates she was fired because of her sex in violation of Title VII and the Act.

4. Scott was fired for lack of productivity. That violated Sears' implied covenant of good faith and fair dealing because:

 (a) Sanders and McDowell led Scott to believe she would not have to meet the productivity quota. She relied on that by not working as hard or competing for scarce work.

 (b) Sears failed to assign Scott enough work to enable her to meet her quota.

 (c) Sears failed to provide Scott with enough training to meet the productivity standards unless she acquiesced in the sexual propositions of the other mechanics.

In addition to discussing the merits of the Title VII claim, Sears' summary judgment motion raises three legal issues:

1. Count II's "implied covenant" claim does not state a cause of action cognizable under Illinois law.

2. No private right of action is conferred by the Act.

3. Scott's Title VII claim is barred by her failure first to file a claim with the Illinois Fair Employment Practices Commission ("FEPC").

Those three issues will be dealt with first, after which Scott's still-surviving claims will be treated.

### *Count II's Implied Covenant Claim*

■ Despite her admitted at-will employee status, Scott claims Illinois law implies a covenant of good faith and fair dealing that limits the circumstances under which Sears could discharge her. But that is not the law in Illinois. In *Payne v. AHFI/Netherlands, B.V.*, 522 F.Supp. 18, 23 (N.D.Ill. 1980) this Court quoted *Criscione v. Sears, Roebuck & Co.*, 66 Ill.App.3d 664, 669–70, 23 Ill.Dec. 455, 459, 384 N.E.2d 91, 95 (1st Dist.1978) in rejecting the very theory now advanced by Scott:

> [R]equiring an employer in an at will relationship to terminate an employee only for a legitimate business reason absent any other restrictions by contract or statute would place the courts in the untenable position of having to assess an employer's business judgment. There has been no attempt by the legislature to

---

**5.** Some of Scott's claims are interwoven or poorly articulated. This Court has considered every possible claim raised by Scott's submissions, in light of the possibility under Rule 15(b) of her ultimately seeking to amend the complaint to conform to the proof.

so alter the State's employment policy and such a step is not one for the courts to make. The rule in this state is that an employment at will relationship can be terminated for "a good reason, a bad reason, or no reason at all."

Indeed, the more recent cases cited by Scott only serve to reconfirm *Criscione*'s vitality. *Dykstra v. Crestwood Bank*, 117 Ill.App.3d 821, 826, 73 Ill.Dec. 307, 311, 454 N.E.2d 51, 55 (1st Dist.1983); *Cuerton v. Abbott Laboratories, Inc.*, 111 Ill.App.3d 261, 66 Ill.Dec. 906, 909–910, 443 N.E.2d 1069, 1072–74 (2d Dist.1982). Count II thus fails to state a claim under Illinois law.

### Illinois Human Rights Act

■ To be sure, the Act prohibits both sex-based employment discrimination and sexual harassment by employers. Ill.Rev. Stat. ch. 68, ¶ 2–102(A) and (D). But it vests in the Illinois Human Rights Commission (the "Commission") exclusive jurisdiction over complaints by private parties. Ill. Rev.Stat. ch. 68, ¶¶ 8–103, 8–111. Private litigants may sue in the courts only for review of the Commission's actions. *Armstrong v. Freeman United Coal Mining Co.*, 112 Ill.App.3d 1020, 1022–23, 68 Ill. Dec. 562, 564, 446 N.E.2d 296, 298 (3d Dist.1983). Accordingly this Court has no jurisdiction over Scott's claim under the Act.

### FEPC Filing

■ Sears argues Scott's Title VII claim is barred because she failed, as 42 U.S.C. § 2000e–5(c) mandates, to file a claim with FEPC in addition to EEOC at least 60 days before filing her lawsuit. In accordance with established practice, EEOC forwarded Scott's claim to FEPC (Scott Mem. Ex. A, date-stamped as received by FEPC September 1, 1981, nearly 11 months before Scott filed her suit). Under the FEPC–EEOC work-sharing agreement, the latter still processed the claim. Of course Sears, with its extensive experience with Title VII, is well aware of that procedure (see its R.Mem. 1–2 n. 1). But its agreeing not to

pursue its argument on this score "if plaintiff comes forward with proof" (*id.*) is disingenuous. This is after all *Sears'* motion for summary judgment, with all reasonable inferences from the evidence (here Scott Mem. Ex. A) to be drawn in *Scott*'s favor.

Thus Scott must be deemed to have satisfied—with EEOC's help—the procedural prerequisites for a Title VII suit. This opinion turns then to the merits under Title VII.

### Summary Judgment Considerations

Surely there can be no mystery as to the operative principles under Rule 56:

1. Rule 56(c) says judgment "shall be rendered" if the pleadings and supporting evidentiary materials:

> show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

2. Facts must be viewed in the light most favorable to Scott, the non-movant, with reasonable inferences drawn in her favor. *Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984).

3. Sears has the burden of showing there is no genuine issue of material fact. *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983).

Yet *each* litigant displays a misunderstanding of those basic concepts.

On the current motion Sears draws its facts exclusively from Scott's deposition testimony and proposed findings of fact. For that reason Sears R.Mem. 3 urges the facts are automatically seen in the light most favorable to Scott, so there can be no issue of fact. That contention is plainly wrong. Scott's testimony contains ambiguities and conflicts and may therefore be susceptible of more than one interpretation. Sears may not pick and choose among her statements in a manner that distorts them, nor may it draw inferences in its own favor from her ambiguous statements.

On the other side of the coin, Scott may not avoid summary judgment merely because a central issue is partly fact-oriented

(Scott Mem. 9). What is required is a *genuine* issue as to one or more *material* facts. Rule 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Scott must, in response to Sears' properly supported factual assertions, identify contrary evidence that could reasonably lead to factual findings in her favor.

### Merits of Title VII Claim

1. *Scott's Refusal To Accede to Gadberry's Propositions*

■ Scott speculates her discharge may have been attributable to her refusal to accede to Gadberry's alleged propositions (Scott Mem. 8, Cont. Dep. 31–33). But she offers no evidence to support that hypothesis or to lead reasonably to such an inference. On the one occasion Sanders consulted Gadberry about Scott's performance (Gadberry Dep. 46), Gadberry testified he gave Scott a favorable evaluation (*id.* at 46–49). Scott has neither challenged that testimony nor offered any evidence McDowell's decision to discharge her was based in any way on Sanders' conversation with Gadberry.

■ It must be remembered Scott bears the burden of proof in the underlying action. It is simply not enough for her to raise a speculative possibility of discrimination. Rather Scott must identify facts giving rise to a *reasonable inference* of discrimination. *Furnco Construction Co. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). She has plainly not done so with respect to her charge of retaliation by Gadberry.

2. *Hostile Work Environment*

Scott claims the sexual harassment to which she was subjected created a work environment so hostile as to constitute a Title VII violation independent of her discharge. Section 2000e–2(a)(1) prohibits discrimination on the basis of sex with respect to "compensation, terms, conditions, or privileges of employment." That language was interpreted in *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972) to include the state of psychological well being at the workplace. At least three Courts of Appeal since *Rogers* have concluded that sexual harassment may so poison a working environment as to alter a "term, condition, or privilege of employment" in violation of Title VII, even if the conduct does not result in a discharge or denial of promotion. *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983); *Henson v. City of Dundee,* 682 F.2d 897, 902 (11th Cir.1982); *Bundy v. Jackson,* 641 F.2d 934, 943–46 (D.C.Cir.1981).

Scott's "hostile environment" claim encounters three major obstacles. Though her failure to surmount the third of those is fatal to her claim, in the interests of completeness all three will be discussed.

(a) *Relief*

■ Scott's Second Amended Complaint seeks only damages for lost wages and benefits resulting from her discharge. But because an "hostile environment" claim is unrelated to discharge, such damages are unavailable here. *Bundy,* 641 F.2d at 946 n. 12. In addition, damages for mental suffering and emotional distress are nonrecoverable under Title VII. *Henson,* 682 F.2d at 905. Finally, because Scott is not entitled to reinstatement she cannot seek injunctive relief to prevent future harassment. *Id.* Thus, even were Scott able to establish an "abusive environment" violation, she would be entitled at most to nominal damages and the possibility of attorneys' fees. *Id.*

(b) *Sears' Liability for Gadberry's Actions*

■ Employers are strictly liable for sexual harassment by supervisory per-

sonnel who have the power to hire, fire or promote.[6] *Horn v. Duke Homes,* 755 F.2d 599, 604–06 (7th Cir.1985); *Vinson v. Taylor,* 753 F.2d 141, 149–50 (D.C.Cir.1985); *Bundy,* 641 F.2d at 947; see also 29 C.F.R. § 1604.11(c). *Vinson* would extend that to *any* supervisory personnel. On the other hand, an employer is liable for sexual harassment by nonsupervisory employees only when the employer has actual or constructive knowledge of the harassment. *Barrett v. Omaha National Bank,* 726 F.2d 424, 427 (8th Cir.1984).

■ Scott cannot attribute to Sears either actual or constructive knowledge of the alleged harassment. She admits she never complained to a superior, and she offers no evidence at all that Sears officials knew of harassment by Gadberry or any other co-worker.[7] Even on the view most favorable to Scott, the harassment can hardly be deemed so pervasive or so severe that constructive knowledge could be imputed to Sears. Scott does not complain of audible vulgarities or behavior that would be apparent to Sanders or McDowell. Nor does she complain of regular harassment by a number of co-workers. Rather, except for an isolated touch and an isolated vulgar comment by Al Williams, she complains of subtle behavior and comments susceptible of innocent interpretations and attributable primarily to a single person, Gadberry.

■ Because Scott has failed to identify facts that indicate Sears' management knew of the harassment, Sears can be held liable only if Gadberry can be considered a supervisor with authority to hire, fire or promote Scott. But Gadberry had no such power, nor was he really a "supervisor" (even assuming *Vinson* were good law in this Circuit). He was merely a brake mechanic assigned to train Scott and work with her. Sanders' having once

asked Gadberry how Scott was performing does not of itself place Gadberry in a position of power to require Scott to submit to harassment she would not otherwise have tolerated. There is no indication Scott knew of Sanders' inquiry or believed Gadberry could influence her status at Sears for better or worse. Gadberry must therefore be considered a mere co-worker.

(c) *Severity of Harassment*

■ Even if Sears *could* be held strictly liable for harassment by nonsupervisory co-workers (as it cannot), Scott's claim would still fail. All the cases (*Katz, Henson* and *Bundy*) cited by Scott to establish that a hostile environment can violate Title VII also teach that not all sexual harassment is severe or pervasive enough to constitute such a violation. *Henson,* 682 F.2d at 904 stated:

> The court in *Rogers* made it clear, however, that the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not affect the terms, conditions, or privileges of employment to a sufficiently significant degree to violate Title VII.

Similarly *Katz,* 709 F.2d at 256 emphasized:

> Title VII is not a clean language act and it does not require employers to extirpate all signs of centuries-old prejudices.

Unquestionably the conduct Scott complains of falls short of the severity and pervasiveness necessary to constitute an actionable hostile environment. It requires only a reading of *Katz, Henson* and *Bundy* to see the shocking and pervasive conduct they portray finds no parallel in the climate at Sears. Apart from an isolated incident with co-worker Williams, Scott was not subjected to vulgarity, demeaning comments, improper inquiries about her private behavior or explicit propositions. Even Scott characterized the behavior of the

**6.** At least two courts have applied a different rule in "hostile environment" cases, requiring that the employer have actual or constructive notice even when supervisors participated in the harassment. *Katz,* 709 F.2d at 255; *Henson,* 682 F.2d at 905.

**7.** Scott can only argue Sears must have known of the harassment because male employees, including Sanders and McDowell, are a closely knit group (Scott Mem. 6–7).

bulk of her co-workers as flirting (Scott Dep. 42–43). And Scott's characterization of the comments of Gadberry and others as "propositions" depends almost entirely on inference.

It may be that some of Scott's co-workers behaved improperly and that she felt uncomfortable. Nevertheless,

> whether an employee is sexually harassed is generally an objective determination and ... the focus of the question of sexual harassment should be on the defendant's conduct, not the plaintiff's perception or reaction to the defendant's conduct.

*Jennings v. D.H.L. Airlines,* 34 FEP Cases 1423, 1425 (N.D.Ill.1984). Judged by such a standard, the work environment at the Sears automotive center cannot be deemed so hostile as to have altered a "term, condition or privilege" of Scott's employment.

### 3. *Gender-Based Discharge Claim*

 Scott's only remaining claim is that she was impermissibly discharged because of her sex. Here the underlying inquiry is always whether the plaintiff's evidence (either direct or circumstantial) raises a reasonable inference of discrimination. *Furnco,* 438 U.S. at 576, 98 S.Ct. at 2949. Once more Scott has failed to present specific facts sufficient to create such an inference.

 *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) stated the method for establishing a prima facie case of discrimination through circumstantial evidence. One of the essential elements of a *McDonnell-Douglas* prima facie case is that the plaintiff is qualified for the posi-

tion at issue. *Parker v. Federal National Mortgage Association,* 741 F.2d 975, 978–79 (7th Cir.1984). Scott is plainly unable to make such a showing. By her own admission, she never achieved the level of productivity normally required of Sears brake mechanics (Scott Dep. 49).

Scott fares no better with assertedly direct evidence of discrimination. She claims McDowell's comment that "he didn't want to pay a woman $7 an hour when he could get a man to do three brake jobs for that" (Scott Dep. 59) indicates she was discharged on the basis of her sex.[8] True enough, *any* reference to sex in the employment context raises a red warning flag. But on analysis the McDowell statement does not support Scott's contention at all.[9]

Without question Scott's productivity after nine months was still well below that expected by Sears. Although Scott protests she was told she did not have to meet quotas during training, she concedes (1) she knew she would have to work up to three brake jobs per day (Findings ¶ 12) and (2) she was warned in April 1981 her job was in jeopardy unless she improved her productivity (Scott Cont.Dep. 46).

It is also undisputed that Sears did not have enough brake work to justify hiring Scott and Otis at full salary after their CETA-subsidized training period had ended. Scott testified there was not enough brake work in the shop to keep the mechanics busy (Scott Cont. Dep. 43–44). No replacements were hired for Scott or Otis, and the remaining mechanics easily absorbed their work (Gadberry Dep. 56–58).

In objective terms Sears laid off Scott—

---

**8.** Scott herself stated in her pro se complaint that she believed she was "laid off for lack of work," not because of her sex. That reflects a different reading of McDowell's comment from the one she now advances.

**9.** Alternatively Scott suggests she was *indirectly* discharged due to her sex because:

 1. She was fired for lack of productivity.
 2. Her productivity was low because the dispatchers discriminated against her in the assignment of work.

As for the first factor, it may perhaps be inferred from (a) McDowell's comment and (b) Scott's not having been replaced. But Scott offers no facts to prove the second element—discrimination by dispatchers (some of whom were women). Moreover, it is not clear any discrimination by a dispatcher can be attributed to Sears.

an underproductive junior[10] employee—when the size of its work force exceeded the volume of work. Fairly read, McDowell's statement reflected an unwillingness to discriminate *in favor of* a woman—Scott—under those circumstances. Had Sears fired a male employee who *was* exceeding its expected production standards (and who was senior to Scott) in order to keep Scott on the payroll, it would have been vulnerable to a meritorious charge of sex discrimination against the discharged male. This Court is not obligated thus to distort Title VII into a vehicle to *promote* discrimination at Scott's behest.

### Conclusion

Scott has failed to identify specific facts that reasonably lead to an inference of discrimination. There is no genuine issue as to any material fact, and Sears is entitled to a judgment as a matter of law. This action is dismissed with prejudice.

10. Scott appears to have been the least senior brake mechanic.