**Clarence STRATTON, Plaintiff,**

v.

**HANDY BUTTON MACHINE COMPANY, Defendant.**

No. 84 C 7958.

United States District Court, N.D. Illinois, E.D.

June 20, 1986.

Rudy J. Huizenga, Beth M. Rivers, Donnelly, Huizenga, Wahl & Hagan, P.C., Detroit, Mich., Elizabeth Hubbard, Chicago, Ill., for plaintiff.

Alan M. Levin, Fredric Bryan Lesser, Dorfman, Cohen, Laner & Muchin, Ltd., Chicago, Ill., for defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Clarence Stratton ("Stratton") sues Handy Button Machine Company ("Handy Button"), alleging Handy Button demoted him and then terminated his employment in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634.[1] Handy Button has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, its motion is denied.

### Facts[2]

In 1963 Handy Button hired Stratton (then 45) as quality-control manager (Stratton Dep. 5, 33–34). His background included a 1950 B.S. degree in industrial engi-

---

1. All further citations to ADEA will simply take the form "Section—," with numerical references to Title 29 rather than to ADEA's internal numbering. This opinion's Appendix treats with the claimed state-based violation mentioned, but not really fleshed out, in the Amended Complaint ("Complaint"). Neither party has dealt with that subject in the current briefing.

2. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (a proposition most recently repeated in *McGraw-Edison Co. v. Walt Disney Productions,* 787 F.2d 1163, 1167 (7th Cir.1986)). For that purpose this Court must view the evidence in the light most favorable to the nonmovant—in this case Stratton. *Black v. Henry Pratt Co.,* 778 F.2d 1278, 1281 (7th Cir.1985).

neering from the University of Illinois, two years as a quality-control supervisor at Buick Aircraft, Engine Division and ten years as a quality-control foreman at Automatic Electric Company (*id.* 8–12). Stratton had also developed a small side business in designing and selling gauges, precision measuring instruments and tools (*id.* 13–14, 16). Shortly after joining Handy Button, Stratton took "special courses" in statistical quality control and a Dale Carnegie course "[i]n how to get along with people and so forth" (*id.* 8–9).

Handy Button manufactures a variety of small metal stampings. As quality-control manager Stratton supervised the quality-control inspectors (*id.* 35). In 1969 he was promoted to technical director, a job that required him to supervise the quality-control manager and to deal directly with customers about quality-control problems (*id.* 36–37). Among his customers was Seaquist Valve ("Seaquist"), a purchaser of stampings for use in aerosol spray cans (*id.* 39).

During 1979–80 Handy Button moved its plant from Chicago to Melrose Park. Stratton was put in charge of the Chicago end of the move, supervising the "tearing down" of machinery for shipment to Melrose Park (*id.* 45–47). Once the move was complete Stratton moved to Melrose Park.

According to Handy Button President Lenard Baritz ("Baritz"), business was "unsatisfactory" and there was no longer a need for a technical director (Baritz Dep. 32–33). At the same time, maintenance foreman Bill Norrie ("Norrie") was also in charge of the tool room, and the combined maintenance-tool room job was "really too big" for one person (*id.*). Norrie was put in charge of the tool room, while Stratton was made maintenance foreman in charge of maintenance. Stratton was not considered for the tool-room job because he had no tool-room experience (*id.* 37–38), while his immediate supervisor, plant manager Dave Little ("Little"), believed he was qualified to supervise maintenance (*id.* 33) despite his lack of direct experience there as well.

Baritz and Little did not consider moving Stratton back to quality control because they thought the then quality-control manager, Ed Dauskurdas ("Dauskurdas"), was better at that job than Stratton had been (*id.* 35). Maintenance worker Ron Buck ("Buck") was also considered for the newly-configured maintenance-foreman job, but Baritz and Little chose Stratton because he was already in management and Handy Button had a "long history" of not laying off managers (*id.* 34). In addition Buck was a "top notch" maintenance man and was needed in that capacity (*id.*). Baritz Dep. 101 says of course he knew Stratton had no maintenance background, but he "felt" Stratton would be able to do a good job.

Stratton's technical-director job ceased to exist. Most of his former duties reverted to Dauskurdas, though Stratton continued to deal directly with some customers (Stratton Dep. 57). As maintenance foreman Stratton was responsible for the condition of all equipment and the building itself (*id.* 78, 85). In his view the job was primarily administrative, not technical (*id.* 100). His hourly employees were "experts" in their fields (*id.* 88), and his main role was to assign work, order parts, keep records and obtain necessary literature about the machinery (*id.* 82, 106). According to Buck, neither Norrie nor Stratton was very knowledgeable about maintenance, but while Norrie's style was to insist on having his way in the face of Buck's better-informed recommendations Stratton would generally defer to Buck's expertise (Buck Dep. 42–44).

Over a series of meetings in spring 1982, Handy Button Vice President Mervyn Mendel ("Mendel") and Little decided to take Stratton out of maintenance (Mendel Dep. 43). They didn't think Stratton was a good personnel supervisor (*id.* 56). In particular Mendel felt Stratton was derelict in his duty to review and sign the maintenance workers' daily work tickets, showing the amount of time each person spent on a particular maintenance project (*id.* 47). Mendel, who supervised Handy Button's

timekeeping department, says company procedure "absolutely" required Stratton to review and sign all work tickets before they were turned in to the timekeeping staff (*id.* 103). Both Stratton and Buck testified to the contrary:

1. Stratton Dep. 86 says the rules allowed employees to give work tickets directly to timekeeping.

2. Buck (who succeeded Stratton as maintenance foreman and is now plant manager) says there was no rule requiring maintenance personnel to give work tickets to the maintenance foreman for his signature before turning them in to timekeeping (Buck Dep. 31–32).

No written personnel procedures for supervisors existed at that time (Mendel Dep. 20).

Baritz points to two particular maintenance problems Stratton never solved but Buck managed to: installation of a new plating line (Baritz Dep. 43) and repairing leaks in the roof (*id.* 46). Baritz Dep. 43 says Buck used "in-house expertise" to do the electrical work. But Buck Dep. 34–35 says he had to hire an outside contractor to do the primary power wiring, at a cost of some $20,000. As to the roof, Stratton Dep. 102 says he tried fixing the leaks with tar, asphalt, sand and pebbles but recommended a full resurfacing to solve the problem completely. Baritz recalls Buck fixed the roof "at nominal expense." (Dep. 47). But again Buck Dep. 32–33 says he hired an outside contractor to resurface the roof for "around $50,000."

Another of Baritz' concerns was the maintenance employees' pulling of too much overtime during a period of business decline (Baritz Dep. 41). In his words the maintenance department was "falling apart" under Stratton's management (*id.* 40). Little told him the maintenance employees were in "rebellion" (*id.* 47), having lost confidence in Stratton because he didn't know what he was doing (*id.* 48).

But a number of the management's messages transmitted directly to Stratton were scarcely negative in nature (really an understatement). At weekly staff meetings Little often complimented Stratton's performance (Farr Aff. ¶ 3;[3] Stratton Aff. ¶ 8). He also received merit-based bonuses in 1980 (for 1979 work) and 1982 (for 1981).[4] Handy Button's annual bonuses were based on Mendel's and Little's recommendations, with Baritz having final say (Baritz Dep. 27). Each eligible employee received a slice of a total pie allocated from the year's profits (*id.*). Though the dollar amount of Stratton's bonuses was relatively small in relation to his salary—$1,300 for 1979 and $850 for 1981 (Int. No. 2)—those figures tied for third-highest among 25 staff members for 1979 and placed fourth among 16 plant supervisors for 1981 (Mendel Dep. Ex. 8 at 5; Int. No. 2).[5] Stratton also received annual raises (which Baritz Dep. 20 says were "always [based on] work performance") of 5% in August 1980 and 9% in August 1981 (See Mendel Dep. Exs. 3, 9).[6]

Mendel and Little spent several months in 1982 "miserablizing" over Stratton (Mendel Dep. 63). Stratton made more money than most other supervisors, and Mendel (*id.*) says it was difficult to figure out

---

**3.** That statement by Handy Button's plating foreman Vincent Farr ("Farr") has been qualified in a supplemental affidavit tendered by Handy Button (Farr Supp.Aff. ¶ 2):

Mr. Little also commended the other foremen and I do not believe he was always sincere and truthful in his commendations.

That, of course, only highlights the factual nature of the issue: It obviously goes to the weight to be given Little's praise, not to whether the praise itself creates a material factual issue about the bona fides of Handy Button's now-professed reasons for terminating Stratton.

**4.** "[D]ue to the severe losses suffered by [Handy Button]" in 1980, no bonuses were paid to anyone for that year (Defendant's Answers to Plaintiff's First Set of Interrogatories ("Ints.") No. 2. At the time Stratton was laid off he was told he would receive no bonus for 1982 (Stratton Dep. 139).

**5.** Figures given in Int. No. 2 and Mendel Ex. 8 (an in-house work sheet) also show the size of the bonus pie was notably lower in 1981 than in 1979, 1982 or 1983.

**6.** Handy Button gave no annual raises in 1982 (Stratton Dep. Ex. 7; Baritz Dep. 27).

"where we could put him that would be productive at his salary." Eventually Baritz, Mendel and Little created a new position, "director of special projects" (*id.* 54). In August 1982 Stratton was moved to that job and Buck was made maintenance foreman (Baritz Dep. Ex. 4). Stratton got the news from Little (Stratton Dep. 128):

A. Dave Little asked me in; said Mr. Baritz would like to have Ron Buck, a younger man, do the job and I'm not going to buck him on it, he said.

Q. Now, you say "a younger man". Were those Mr. Little's words?

A. Yes.

Q. Is that an exact quotation?

A. That's an exact quotation.

As director of special projects Stratton initially had several tasks:

1. continuing to chair a management committee formed in late 1981 and charged with developing an aerosol can part requested by Seaquist (Baritz Dep. 64–65; Mendel Dep. 75–77);

2. exploring energy conservation methods (Stratton Dep. 130):

3. finding a way to speed up the aerosol mounting-cup presses (*id.*);

4. expediting installation of the plating line (*id.*);

5. pricing new molding machines (*id.*);

6. overseeing computerization of inventory information (*id.*); and

7. finding a cheaper source for certain rubber and plastic gaskets used by a Handy Button subsidiary (Baritz Dep. 72–73).[7]

He was given a desk "in the aisle of the Engineering Department without even a telephone" from which to operate (Stratton Aff. ¶ 11).

Handy Button had a bad year in 1982. There had been a seven-week strike and a wage freeze, and the company lost "sub-

stantial money" (Baritz Dep. 96). At weekly staff meetings Little often said those over 62 "should retire" (Stratton Aff. ¶ 9) or "should consider retirement" (Farr Aff. ¶ 7).[8] Though Stratton contends he accomplished much of what he was asked to do (speeding up the presses, pricing the molding machines, coordinating installation of the plating line and effecting some energy conservation by covering the factory's skylights with plastic) (Dep. 137), he did not develop the aerosol can part or locate suitable rubber gaskets (Baritz Dep. 71, 75).

As director of special projects Stratton was one of Handy Button's highest-paid employees (Baritz Aff. ¶ 5), making a salary in the "mid-30's" (Baritz Dep. 97). During monthly meetings in October, November and December 1982 Baritz, Mendel and Little discussed Stratton's employment, and on the first Monday of December they decided to lay him off (Int. No. 17). Baritz Dep. 97–98 says in a poor business climate Handy Button could not afford to keep a "nonproductive employee" at Stratton's salary. Mendel denies Stratton was laid off "because of his work performance as special projects director" (Dep. 82) but says simply (*id.* 91):

The company decided to eliminate the position.

Stratton was not told of his layoff until January 1983 (Stratton Dep. 139). About a week after that he went to Little's house to pick up a letter of recommendation, and Little told him (Stratton Dep. 156):

I suggest you go to EEOC for age discrimination and human services.

Stratton Dep. 157–59 goes on to describe that conversation:

Q. And did you discuss the circumstances of your termination?

A. No.

---

7. Stratton Dep. 131 denies he was given that assignment.

8. Farr Suppl. Aff. ¶ 3 says:

Mr. Little never stated or implied that anything negative would happen if those persons did not retire. Mr. Little made those statements in the context of an offer, so that if

those eligible for social security and with a pension retired, the company could avoid laying off other foremen.

Once again that poses a question for the trier of fact as to Little's (and therefore Handy Button's) intent.

Q.   Okay.  What did you say to him?

A.   I don't recall what I said to him at that time.  When he says for age discrimination, I just figured that's why I was let go.

Q.   When did he say this in the conversation?

A.   After he gave me the resume; after he gave me my recommendation.

Q.   Did you say anything to him?

A.   No; not that I recall.  I don't know what I did say.

Q.   Are you telling me that he just out and out said why don't you go to the EEOC?

A.   He felt sorry for me.

Q.   What did he say?

A.   He said it was unfair.

Q.   He told you it was unfair?

A.   Yes.

Q.   What else did he say?

A.   That's about it.

\*      \*      \*      \*      \*      \*

Q.   Did he say why?

A.   No; he didn't say.

Q.   Did he say anything about that he knew that you were fired because of age discrimination?

A.   He said because of that, yes, I should go see the EEOC.

Q.   Because of what?

A.   My age.

Q.   What did he say?

A.   Just what I told you.

Stratton took Little's advice, and this lawsuit is the result.

### Age Discrimination Analysis

As almost invariably occurs in employment-discrimination cases, the parties offer widely divergent interpretations of a welter of facts.  That bodes ill for Handy Button's motion, because Rule 56 permits the grant of summary judgment only:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law.

Of course many facts are disputed in this case.  What Handy Button must show is such disputes are either (1) not genuine or (2) not material.  As *Backes v. Valspar Corp.,* 783 F.2d 77, 78–79 (7th Cir.1986) recently put the test:

> But at the summary judgment stage the burden of proof is on the moving party, in this case the defendant, to show that the outcome of a trial would be a foregone conclusion because with discovery complete the opposing party has turned up no evidence of an essential element of his case or defense.

"No evidence" means precisely that: It is a cardinal summary judgment principle that the court "may not evaluate the credibility of the witnesses" but must take statements at face value (*Stewart v. RCA Corp.,* 790 F.2d 624, 628–29 (7th Cir.1986).  Further, facts—especially in discrimination cases—do not always trumpet their own full significance.  Intent (though inherently subjective) must perforce be inferred from its objective manifestations, and people (especially sophisticated ones) frequently mask discriminatory motives if they have them.  Not surprisingly, in Rule 56 terms the nonmoving party is entitled to the benefit of any reasonable inferences that can be drawn from ambiguous fact situations (*Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984)).

Thus the first step in this Court's analysis is to establish the "essential element" of Stratton's case.  *LaMontagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984) (citations omitted) teaches:

> The ultimate burden on a plaintiff in an age discrimination case is to prove that he was discharged because of his age. . . .  To accomplish this, he must prove not that age was the sole factor motivating the employer to discharge him but that age was a "determining factor," in the sense that he would not have been discharged "but for" his em-

ployer's motive to discriminate against him because of his age.

That does not of course mean a defendant must hate old people: To discriminate means merely to make a distinction on the basis of the prohibited factor.

With those principles in hand, Stratton's case is rather straightforward. He offers two avenues to circumvent summary judgment:

1. the "prima facie case" model of proof developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981) and

2. direct evidence of discriminatory intent (see *LaMontagne,* 750 F.2d at 1409).

Stratton wins both ways.

## 1. Prima facie Proof and the Shifting of Burdens

*Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 96 (7th Cir.1985) (citations omitted) establishes the elements of a prima facie ADEA case in replacement situations:

> This circuit has adapted a variation of this prima facie test in age discrimination cases where the plaintiff was replaced in his position by a younger person.... In these cases we held that in order to establish a prima facie case of age discrimination, the plaintiff must show that: (1) he was a member of the protected class (persons aged 40 to 70); (2) he was qualified for his position; (3) he was terminated; and (4) he was replaced in his position by a younger person.

It is not really clear from the Complaint whether Stratton is (1) charging his transfer to Director of Special Projects and his termination as separate acts of discrimination or (2) merely reciting the transfer as an evidentiary element in support of his termination claim.[9] If the former, Stratton

has obviously met the fourth *Stumph* element as to his termination, for he was replaced by Buck, a much younger person. If the latter, *Stumph,* 770 F.2d at 96–97 went on to say where a person's job is eliminated there is obviously no need to show replacement by a younger person.

Whatever the nature of the claimed discrimination, Stratton unquestionably meets two of the remaining three *Stumph* criteria: He was in the protected class and he was terminated. But Handy Button says he was not "qualified for his position" as maintenance foreman or director of special projects. "Qualified" has different meanings in different employment contexts. Normally the term refers to the educational background, prior experience and personal characteristics an employer reasonably thinks a job candidate must have to be considered for hire. But a person may possess those threshold qualifications and, once hired, fail adequately to perform the job. Though it stretches normal language usage to say such a "qualified" person has become "unqualified," satisfactory job performance may reasonably be considered a "qualification" for continued employment. Thus *Huhn v. Koehring Co.,* 718 F.2d 239, 243 (7th Cir.1983) said (quoting *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir. 1979)):

> As to the second element of a *McDonnell Douglas prima facie* case, a plaintiff must establish that he "was performing his job at a level that met his employer's legitimate expectations"....

That formulation can tend to promote confusion. If an employee must show satisfactory job performance as part of the prima facie case, that element of proof tends to merge with the second step in the *McDonnell Douglas-Burdine* ping-pong match: the employer's articulation of a "legitimate, nondiscriminatory reason" for the adverse employment action. Obviously an employee's failure to perform adequately is a legitimate, nondiscriminatory reason for

---

**9.** Complaint ¶ 14 seeks (among other relief) "reinstatement to his former position," but it does not specify *which* former position.

termination or demotion. When that is the employer's articulated reason for dismissal, it really doesn't matter whether the analysis takes place at stage oné (the prima facie case) or stage three (the pretext). Thus if Stratton has some evidence he was meeting Handy Button's legitimate expectations, that would create a material fact issue as to both (1) his "qualification" for the jobs and (2) the pretextual character of Handy Button's reason for laying him off.

Stratton has offered such evidence. He was awarded a merit-based bonus for his 1981 work as maintenance foreman and a 9% merit-based raise for that year as well. No raises were given to anyone in 1982, so Stratton's non-receipt that year signifies nothing. And 1982 bonuses weren't given until after Handy Button had decided to fire him, so again his absence from the bonus rolls is not probative. To return to the single relevant year of 1981 (for Handy Button claims Stratton had neither the background nor the ability to handle the maintenance-foreman job), a trier of fact could reasonably find it inconsistent for Handy Button to have rewarded Stratton with a bonus and raise after his first year on that job.

In addition, Little praised his work as maintenance foreman. Though Farr now says that praise may have been insincere, that is a credibility question for the trier of fact, not this Court.

As for the special-projects job, the parties dispute how much Stratton accomplished. Though Stratton concedes he did not develop a source for the aerosol can part, he says he did most of the other tasks. Further, where Baritz, Mendel and Little began talks about his performance less than two months after he started as director of special projects and determined to fire him after less than four months in that job, a factfinder could reasonably infer they never had a sincere intention of allowing him to prove himself.

Stratton's brief tenure as director of special projects points up the kind of confusion fostered by *Huhn*'s "qualification" analysis. That job was created especially for Stratton, supposedly tailor-made to the abilities and personal characteristics he had demonstrated over his nearly 20 years at Handy Button. To shape a specific job for him with such full knowledge and then to say he was not qualified for it is an odd use of that concept. Handy Button's motives—if sincerely directed toward finding Stratton a niche—might be laudable, as the company suggests. But if the idea was to create a free-form position, load it up with a lot of tasks and then fire Stratton at the first opportunity to say he wasn't performing, that places the analysis in the realm of pretext, not qualifications. And with Stratton getting a phoneless desk in the aisle,[10] Handy Button's sincere interest in having him complete his tasks is further at issue.

Assuming arguendo Stratton has made out a prima facie case, Handy Button says its legitimate, nondiscriminatory reason for laying Stratton off was pure economics: Times were tough and the company was tightening its belt. But that doesn't tell the whole story. Baritz says the company could not afford to keep a "nonproductive employee" at high salary. That means if Stratton had been "productive," he might not have been terminated. Once again that focuses on the material fact issue surrounding Stratton's job performance.

Other record facts call the credibility of Handy Button's articulated reason (and hence its non-pretextual nature) into serious question. Mendel says Stratton did not follow company procedure regarding work tickets. But Buck (Stratton's successor as maintenance foreman) says no such procedure existed. Further, Baritz's recollection of the plating-line and roofing problems is contradicted by Buck (as well, of course, as by Stratton). Where Baritz implies Stratton should have used "in-house expertise" on the plating line and should have solved the roofing problem "at nominal expense," Buck himself turned to outside contractors on both jobs, at considerable expense.

---

**10.** This Court has always previously thought the stories of moving unwanted executives out of their offices and into the corridor were apocryphal.

That is not to say Baritz's dissatisfaction with Stratton could not have been legitimate even in the face of Buck's later failure to do the work in-house, but Baritz's inaccurate version of Buck's resolution of the problems suggests a post-hoc rationalization and not a contemporaneous rationale.

As was pointed out in Judge Decker's opinion adopted on appeal in *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir.1980) (per curiam), an ADEA claim does not license a court to second-guess the defendant's business decisions. This Court consistently rejects that impermissible approach; see, e.g., *Parker v. Federal National Mortgage Association*, 567 F.Supp. 265 (N.D.Ill.1983), *aff'd*, 741 F.2d 975 (7th Cir.1984); see also *Homola v. Carlin*, No. 83 C 8108 (N.D.Ill. May 3, 1985), *on reconsideration* (N.D.Ill. June 10, 1985), [Both available on WESTLAW, DCTU database], *aff'd and opinion adopted*, 793 F.2d 1295 (7th Cir.1986) (unpublished order)(same approach under Title VII). In like manner, this opinion should not be misread as substantively rejecting the merits of Handy Button's actions toward Stratton from 1980 to January 1983. What *is* plain is the existence of material fact questions as to whether Handy Button's professed reasons were those that actually motivated its actions.

### 2. Direct Evidence of Discrimination

Stratton's alternative approach makes the just-stated conclusion even stronger, for he has also offered direct evidence of age-based animus. That sort of evidence goes beyond the *McDonnell Douglas-Burdine* inferential-proof method, for as this Court explained in *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1128 (N.D.Ill. 1986):

If a plaintiff has more direct evidence of a discriminatory motive than the employer's "otherwise unexplained" adverse treatment, the inquiry skips over the first two steps of the *McDonnell Douglas/Burdine* ping-pong scheme, and issue is joined directly on the question of tainted motivation.

As in *Rizzo* and in *Stumph*, 770 F.2d at 98 (on which *Rizzo* relied), Stratton has offered several statements directly indicating age-based discrimination:

1. Little told Stratton the company wanted Buck, "a younger man," to take over as maintenance foreman.

2. Little told staff members over 62 they "should retire" or "should consider retirement."

3. Little suggested to Stratton he should "go to EEOC for age discrimination."

In *Stumph* terms those statements would be enough to foreclose summary judgment. There defendant's president ("Cronk") allegedly told the 55-year-old plaintiff (770 F.2d at 94):

the Company was going to have to get rid of some of its older employees and get a young, aggressive organization in place for when the economy turned around.

Two months later Cronk told plaintiff his job was being eliminated because business was bad. Plaintiff also presented statements of two voluntarily-retired fellow employees who simply said they "felt" unwelcome because of their ages and so chose to retire (*id.* at 95).

That evidence obviously was not very strong. But as *Stumph* (*id.* at 98) pointed out, weak evidence that might not prevail at trial is still evidence, and this Court cannot now weigh its probative value. Surely the pieces of evidence adduced by Stratton stand in an a fortiori position to the *Stumph* rejection of summary judgment.

Handy Button tries to avoid the effect of Little's statements in several ways. First, Little is dead, and he was never deposed.[11]

---

**11.** Handy Button's suggestion of unfairness or impropriety in considering Little's alleged statements as to age discrimination displays an unwitting irony. After all, many of Handy Button's own assertions through Baritz and Mendel are really Little's statements and observations.

But the Federal Rules of Evidence contain no "dead-man's act" (see Advisory Committee Note, Fed.R.Evid. 601). And Little's statements are nonhearsay under Fed.R. Evid. 801(d)(2)(D). Finally they are neither irrelevant nor immaterial. Little's statement about retirement *may* have been an "offer" and not a threat, as Farr's supplementary affidavit would have it, but Farr's own statement offered by Handy Button suggests the company would have preferred older workers to retire rather than its having to lay off younger ones. Again age "discrimination" need not imply dislike. If Handy Button believed (say) younger workers had families to support while older ones could at little sacrifice retire on Social Security and a pension, a preference for the latter eventuality indicates age-based motivation.

Little's suggestion that Stratton go to EEOC is of course somewhat ambiguous. It might perhaps be read to mean:

> I don't want to hear your complaints. If you think you have a case, go to the EEOC and don't bother me.

But in the enlarged context described by Stratton it would be far more reasonable to read it as meaning Little—who after all was privy to all the decisions concerning Stratton—thought Stratton had a valid claim. And even if the ambiguity is viewed as a balanced one,[12] a more attentuated ambiguity barred summary judgment in *Graham v. F.B. Leopold Co.*, 779 F.2d 170, 173 (3d Cir.1985), where plaintiff's supervisor allegedly (*id.*):

> made the statement that he felt very strongly that I should take this to court and fight it.

True, one judge dissented in *Graham*. But in *Graham* the "go fight it" statement was the *only* evidence of discriminatory motivation, while here Stratton offers at least two others.

Little's statement about Buck ("a younger man") may also be read two ways—as expressing an age-based preference or, as Handy Button would have it, as merely descriptive (Buck was younger, after all). Though that statement alone would have real difficulty in supporting an ADEA claim (see this Court's opinion in *Parker*, 567 F.Supp. at 270–71, and the affirmance, 741 F.2d at 980), Handy Button cannot thus separate the strands and argue that none by itself has a rope's tensile strength.

Handy Button also says statements about Stratton's transfer from maintenance foreman to director of special projects are not relevant because that in itself was not an "adverse" employment action: While not a promotion, it was simply a lateral transfer. Stratton retorts it was a demotion because he was stripped of most of his maintenance responsibilities, while no significant new duties were added. He had been working on the aerosol can project since 1981, and he had been responsible for coordinating installation of the plating line all along. Whether or not the other duties he took on were "significant" enough to permit characterization of the move as simply lateral is another fact issue not resolvable here.

Finally as to that move, Stratton says the rapidity of his demise as director of special projects creates the inference that job was created only as a way-station to his layoff. That inference is surely possible, for his tenure was already under consideration less than two months after the transfer. It is true the contrary inference Handy Button suggests is also plausible: They liked Stratton so much they tried desperately to find a niche for him in spite of poor business conditions. But once more—and now for the last time—it must be said a summary judgment motion is not the occasion to weigh competing inferences. If Stratton is entitled to his inferences (and he is), then Little's statement about Buck is obviously material and relevant.

### Conclusion

Handy Button's is a motion that should never have been filed. It has needlessly

---

As Baritz Dep. 16, 19 says, Little was Stratton's supervisor, and Little then reported to Baritz.

**12.** That would reverse the proper approach to Rule 56 inferences (see n. 2).

burdened opposing counsel and this Court (which unfortunately has no remedy for the bootless expenditure of time that could better have been spent on other cases on its heavy calendar). Where discovery has been completed and all the facts are in,[13] there is no justification for a Rule 56 motion filed in the teeth of known and obvious material fact issues.

There are indeed genuine issues of material fact as to Handy Button's motivation in terminating Stratton. Its summary judgment motion is therefore denied.

## APPENDIX

Complaint ¶ 13 asserts a violation of both ADEA and the Illinois Human Rights Act ("IHRA"), Ill.Rev.Stat. ch. 68, ¶¶ 1–101 to 9–102. But nothing else in the Complaint speaks of IRHA at all:

1. Complaint ¶ 3 says "this action arises under" ADEA. No jurisdictional predicate (such as pendent jurisdiction) is advanced for an IRHA claim.

2. There is no effort to divide the Complaint into more than a single count.

3. Complaint ¶ 5 is silent as to IRHA, stating only:

> Plaintiff has complied with all jurisdictional prerequisites to filing this suit by seeking both Federal and State agency relief for age discrimination within the time required, and that 60 days have since elapsed.

It is therefore far from clear whether Stratton is making an IHRA claim here or is merely making superfluous reference to that statute for dramatic effect. Even were he essaying the former, IHRA's carefully-drawn scheme of administrative procedure and judicial review does not permit de novo federal judicial consideration of an IHRA claim (*Scott v. Sears, Roebuck & Co.*, 605 F.Supp. 1047, 1053 (N.D.Ill.1985); *Curtis v. Continental Illinois National Bank*, 568 F.Supp. 740, 742–43 (N.D.Ill. 1983)). Unlike ADEA, which merely re-

quires a plaintiff to wait 60 days after administrative *filing* before bringing suit (see Section 626(d)), IHRA contemplates actual exhaustion of administrative remedies followed only by judicial review under the Illinois Administrative Review Act (*Stoecklein v. Illinois Tool Works, Inc.*, 589 F.Supp. 139, 145 (N.D.Ill.1984)).

It seems more likely, then, that Stratton's allegation he has complied with "all jurisdictional prerequisites" and has waited more than 60 days is directed only to ADEA and does not address the prerequisites to judicial review of an IHRA claim. Indeed, if it were otherwise—if Stratton had exhausted his state administrative remedy—any current IRHA action would be barred on res judicata grounds (*Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)).

Thus there is no predicate for Stratton's possible assertion of an IHRA claim here. Accordingly reference to IHRA must be and is stricken from the Complaint.

---

13. Discovery was closed, and this case was set for the filing of a final pretrial order, and for a prompt pretrial conference to review that order and ready the case for trial, when Handy Button announced its proposed filing of the current motion. That caused this Court to vacate the scheduled procedure, sidetracking the progress toward trial.