**Robert ZICK, Plaintiff,**

v.

**VERSON ALLSTEEL PRESS CO., Defendant.**

**No. 85 C 6598.**

United States District Court, N.D. Illinois, E.D.

Sept. 29, 1986.

**3.** U.S. Const. amend. VII.

Richard Puchalski, Doss, Puchalski, Keenan & Bargel, Chicago, Ill., for plaintiff.

James W. Gladden, Jr., Arthur J. Kowitt, Robert T. Zielinski, Mayer, Brown & Platt, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Robert Zick ("Zick") has sued his former employer, Verson Allsteel Press Company ("Verson"), claiming Verson terminated his employment in violation of the Age Discrimination in Employment Act ("ADEA"),[1] 29 U.S.C. §§ 621–634.[2] Verson now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, the motion is granted.

### Facts [3]

Verson hired Zick (then age 29) in 1956 (Zick Aff. ¶¶ 2–3).[4] Verson manufactures and services industrial press equipment used in stamping and cutting sheet metal and other materials (Smith Aff. ¶ 3). As of July 1984 Verson had four manufacturing plants, located in (*id.* ¶ 4):

1. Chicago (Verson's headquarters (*id.* ¶ 5));
2. Dallas;
3. Charleroi,[5] Belgium; and
4. Darlaston, England.

Verson's sales force is supervised by its Regional Marketing Managers ("RMMs") (*id.* ¶ 7). Until 1979 Verson had six RMMs, deployed as follows (*id.* ¶¶ 10, 12–13):

1. Jack McKinney ("McKinney") and Jack Webber ("Webber") in Chicago;
2. Frank Mathis ("Mathis") in Dallas;
3. Dave Bonnar ("Bonnar") in Detroit;
4. Joseph Engerski ("Engerski") in London, England; and
5. Emmett Woodson ("Woodson") in Dallas.

---

1. This Court's December 3, 1985 memorandum opinion and order (623 F.Supp. 927) dismissed Zick's pendent state-law claim, which asserted breach of an implied covenant of good faith and fair dealing.

2. All further citations to ADEA will simply take the form "Section—," with numerical references to Title 29 rather than to ADEA's internal numbering.

3. Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose this Court must view the evidence in the light most favorable to the nonmovant—in this case Zick (*Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)).

4. Nothing of record shows what Zick's initial job was.

5. Both sides' submissions refer to that city as "Charleois," which appears almost certainly to be a misspelling for Belgian industrial center Charleroi. This opinion will stick with its gazetteer rather than the parties' usage. Additionally, several inconsistencies in the spelling of Verson employee names will necessarily be ignored.

Engerski had responsibility for European sales, and Woodson oversaw sales in South and Central America (*id.* ¶¶ 12–13). Unlike the other RMMs, Engerski and Woodson were both Verson officers and had additional responsibilities (*id.*).

In 1979 Verson decided to open a new sales office in either Atlanta, San Francisco or Los Angeles (Zick Dep. 22). Zick, who was in Charleroi at that time, was offered both (1) the new RMM position and (2) the choice of opening the sales office in any one of those three cities. He chose Atlanta, moved there and set up the Verson office in his home (*id.* 22–24, 27). In late 1982 or early 1983 Zick's territory was expanded to include the Eastern Seaboard states (*id.* 28).

Though he recalls no specifics of his sales performance during the early 1980s, Zick does remember making one $12 to $14 million sale in 1982 (*id.* 34; Zick Aff. ¶ 8). Verson's most productive sales office was the one in Detroit, which served the automobile industry (Zick Dep. 31, 33; Smith Aff. ¶ 12).

Verson hit hard times, losing an aggregate of some $10 million in the 1983 and 1984 fiscal years (Smith Aff. ¶ 22). Verson Executive Vice President Donald Smith ("Smith") sought to reduce costs through staff reductions and consolidations (*id.* ¶ 24). During July 1984 Smith instituted several such measures:

1. Verson's London sales office was closed (*id.* ¶ 25).

2. International staff was pared down, and Engerski (age 56) and Woodson (age 58) lost their positions. Woodson was reassigned to a domestic territory out of Dallas, and Engerski became an RMM in Chicago (*id.* ¶¶ 19, 20, 25, 32).

3. Verson's Singapore office was closed, and salesman Kevin Kelleher ("Kelleher"),[6] who ran it, was transferred to the Darlaston plant, from which he continued to handle Versons' Far East business (Smith 2d Aff. ¶¶ 11–13; Zick Dep. 129).

4. Verson closed the Atlanta office, consolidating the territory with Dallas and Chicago (Smith Aff. ¶¶ 26, 32).

5. Zick (age 57), Webber (age 60) and Mathis (age 51) were laid off (*id.* ¶¶ 15, 17–18, 31).

6. Al Grizzetti ("Grizzetti") (age 48), a salesman in the Detroit office, was made a service representative, also in Detroit (Smith 2d Aff. ¶¶ 8–10; Farnesi 2d Aff. ¶ 2).

7. Five nonmarketing employees were laid off (Farnesi 2d Aff. ¶¶ 3–4):

(a) D. Abrahamson (age 56);

(b) B. Judnic (age 24);

(c) R. Bender (age 47);

(d) C. Rakowski (age 29); and

(e) George Bozich ("Bozich").[7]

Thus after the July 1984 terminations Verson had four RMMs:

1. Engerski (age 56) in Chicago;

2. McKinney (age 55) in Chicago;

3. Bonnar (age 59) in Detroit; and

4. Woodson (age 58) in Dallas.

Smith Aff. ¶¶ 27–30 say he chose to keep those four, letting Zick, Webber and Mathis go, because:

1. Engerski and Woodson were both corporate officers and "accomplished sales managers," and Engerski had "valuable engineering experience."

2. Detroit was Verson's key sales office, and Bonnar was needed there to "maintain continuity with our important auto industry customers and to avoid relocation expenses."

3. McKinney was more senior than Webber in Chicago (by 23 years, Smith Aff. ¶¶ 14–15) and did not need to be relocated.

4. While Grizzetti's Detroit sales position was eliminated, Grizzetti's 19 years of technical experience qualified him to assume the newly created Detroit service

---

6. Zick Aff. ¶ 9 says Kelleher was "in his thirties."

7. Zick Aff. ¶ 6 says Bozich was "fifty-years of age or older." Farnesi 2d Aff. ¶ 4 says Bozich (unlike any of the others discussed in this opinion) "was terminated for performance reasons."

representative job, which Smith expected to be a new profit center (Smith 2d Aff. ¶¶ 5–10). Zick Dep. 127 admits he was not qualified for a service representative's job.

Verson had no quarrel with any RMM's job performance (Smith Aff. ¶ 21). Assertedly to avoid "serious morale problems," Verson gave Zick and those laid off with him no advance notice of their terminations (Smith 2d Aff. ¶ 4). Shortly after Zick got the news, he went to see Verson Treasurer Bud Ward ("Ward") to find out the status of his pension (Zick Dep. 72). According to Zick Dep. 74–75:

A. [Ward] [j]ust [said] he didn't like the way it was handled.

Q. Mr. Ward said this?

A. Yes.

Q. What exactly, as best you remember, did Mr. Ward say?

A. Well, there was some conversation about old people and had to get the money. I can't tell you what the words were.

Q. I'm not looking for what the exact words were, I'm looking for the substance of what Mr. Ward told you, not what you told him, but what he said to you.

A. This was substance as to my dismissal, we're trying to figure out why. That's when the conversation came around older people, cutting the overhead, and what have you. General conversation about that subject.

There may have been other people there at that time. I can't honestly recall because they were coming in and going out all the time.

Q. Who suggested that perhaps the termination was because the company was trying to cut overhead with older people?

A. That was the rumor, or whatever you have, that was going on. It was the gist of the conversation in that given moment.

Q. Who made that statement, was it Mr. Ward, was it you, was it somebody else that was in the room?

A. I asked why. Mr. Ward sort of suggested that could have been it.

Q. How old is Mr. Ward?

A. I have no idea.

Q. Is he more than 50?

A. I don't know how old. I imagine he is over 50.

Q. Anything else that you remember of that conversation?

A. Pardon?

Q. Anything else that you remember about that conversation?

A. No. It was—everybody was in shock of what happened.

Zick Aff. ¶ 7 fleshes out his recollection of that conversation:

During my conversation with Mr. Ward, I asked him why I had been discharged. Mr. Ward's reply was words to the effect: "that's the way it generally happens, you get rid of the older guys with the benefits."

Smith 2d Aff. ¶ 3 says Ward had no role in determining what jobs would be eliminated or what individuals terminated.

### Zick's Theories

Zick offers alternative theories for his age-discrimination claim:

1. Ward's statements are direct evidence Verson's actions were age motivated.

2. Several facts give rise to an inference of discrimination:

(a) Zick had obtained a multimillion dollar contract while Verson was in financial difficulty.

(b) Younger employees were allowed to transfer into new jobs while Zick and his fellow older employees were not.

(c) Verson did not base its termination decisions on an evaluation of any employee's job performance, instead using "subjective factors."

(d) Zick and those terminated with him were fired without warning.

Neither approach—direct or inferential—is sufficient to withstand summary judgment.

## Analytical Framework [8]

Rule 56 permits a grant of summary judgment only:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Verson must therefore show Zick has raised "no genuine issue as to any material fact" tending to show age discrimination. As *Backes v. Valspar Corp.*, 783 F.2d 77, 78–79 (7th Cir.1986) put the test:

> But at the summary judgment stage the burden of proof is on the moving party, in this case the defendant, to show that the outcome of a trial would be a foregone conclusion because with discovery complete the opposing party has turned up no evidence of an essential element of his case or defense.[9]

*La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1409 (7th Cir.1984) teaches the "essential element" in an ADEA case is plaintiff's proof:

> not that age was the sole factor motivating the employer to discharge him but that age was a "determining factor," in the sense that he would not have been discharged "but for" his employer's motive to discriminate against him because of his age.

■ Verson cannot contend Zick has failed to make out a "prima facie case" of age discrimination in the special sense that term carries in employment-discrimination cases. He was:

1. a member of the age–40–to–70 protected class (29 U.S.C. § 631(a) );
2. qualified for his position; and
3. terminated.

That is all he must show where his position has been eliminated due to a reduction in force (*Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 96–97 (7th Cir.1985) ).[10] According to the familiar "ping pong" formula (*id.* at 97):

> the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for his action; and, finally, the plaintiff may show that the employer's stated reason for his action was in fact pretextual, and that the real reason was discriminatory. *McDonnell Douglas [Corp. v. Green]*, 411 U.S. [792] at 802–04 [93 S.Ct. 1817 at 1824–25, 36 L.Ed.2d 668 (1973) ].

For his part Zick cannot contend Verson has failed to "articulate some legitimate, nondiscriminatory reason for [its] action." That burden is one of "articulation" only (*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981) (citation and footnote omitted) ):

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons.... It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.

---

**8.** This Court has purposefully opted for the approach articulated in this section, rather than the somewhat easier path marked out by *Matthews v. Allis-Chalmers*, 769 F.2d 1215 (7th Cir. 1985) (per curiam) (and cases that follow it): a path an employer can more readily pursue en route to a summary judgment against a reduction-in-force employment discrimination claim. As the Appendix to this opinion points out, our Court of Appeals has been sending out conflicting signals in this area. Both (1) because this Court views the more difficult employer's path as sounder in analytical terms and (2) to avoid any potential problem if this Court were to follow *Matthews* but a Court of Appeals panel believed the other path was the correct one to follow, this opinion has chosen the more conservative line of approach.

**9.** [Footnote by this Court] As ADEA cases are governed by the general preponderance-of-the-evidence standard of proof, nothing in *Anderson*, 106 S.Ct. at 2514 modifies *Backes*' applicability here.

**10.** See Appendix.

In a summary-judgment context, of course, raising genuine issues of fact is usually fatal to the movant. But that small irony is merely a product of the formulaic way *McDonnell Douglas* and *Burdine* have structured employment-discrimination cases. Verson's evidence "articulates" both (1) why it eliminated several positions and (2) why it reassigned and laid off specific personnel in the way it did. Thus, to analogize to another sort of legal formula, the question here—whether Zick's age was a "determining factor" in his termination—has been pleaded to issue: Are Verson's stated reasons pretextual?

■ "Pretext" is not a term of art here. That term means only (*Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093):

> plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[11]

Thus proof the stated reasons were not the "true reasons" can take any form that would impeach the employer's statement. Generally that can be done in either of two ways:

> 1. through statements or other evidence expressing an employer's discriminatory animus, notwithstanding any reasons the employer has articulated,[12] or
>
> 2. through evidence otherwise undercutting the credibility of the employer's proffered reasons.

■ But what cannot be used to argue "pretext" is evidence the employer acted irrationally (so long as it was not age-based irrationality) or failed to follow sound business practices. As *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir.1980) (Judge Decker's opinion below, adopted per curiam on appeal) (citation omitted) said:

The Age Discrimination in Employment Act, however, was not intended as a vehicle for judicial review of business decisions.... The question before the court is not whether the company's methods were sound, or whether its dismissal of [plaintiff] was an error of business judgment. The question is whether he was discriminated against because of his age.

Thus it is simply irrelevant, even if true, that Verson did not consider Zick's sales record in determining whether or not to lay him off (Stmt. Genuine Material Facts ¶ 6; see also Zick Mem. 11–12). After all, Verson concedes *all* RMMs did their work well but says its decision was based on other considerations. By the same token, Zick Mem. 13 is equally misguided in arguing the suddenness of Verson's termination process "directly impacts upon plaintiff's claim." That may not have been sound business practice, and it is potentially abusive personally. But it simply stands mute as to age-based animus.

With those preliminary issues out of the way, this opinion will now treat with Zick's more focused claims. They will be divided into the two categories already discussed.

### Direct Evidence of Discrimination

■ Zick points to Ward's alleged statements as direct evidence of Verson's discriminatory intent. Several recent cases have denied ADEA defendants' summary-judgment motions in the face of employer statements suggesting age-based motivation.

In *Stumph*, 770 F.2d at 94, defendant's president ("Cronk") allegedly told the 55-year-old plaintiff:

> [T]he Company was going to have to get rid of some of its older employees and get a young, aggressive organization in place when the economy turned around.

Two months later Cronk told plaintiff his job was being eliminated because business

---

**11.** [Footnote by this Court] Of course on an employer's summary judgment motion the ex-employee does not have a preponderance-of-evidence burden. It is enough for him to raise a genuine issue of fact as to pretext.

**12.** See Appendix.

was bad. Plaintiff also presented statements of two of defendant's former employees who simply said they "felt" unwelcome because of their ages and so chose voluntarily to retire (*id.* at 95). *Stumph, id.* at 98 found that evidence sufficient to establish a fact issue as to defendant's discriminatory motivation.

Similarly, in *Rizzo v. Means Services, Inc.,* 632 F.Supp. 1115, 1124–25 (N.D.Ill. 1986) plaintiffs offered a number of statements by defendant's manager expressing a desire or intent to "get rid of" employees who were "too old." This Court held that evidence barred summary judgment, though defendant had claimed plaintiffs' layoffs were solely for economic reasons (*id.* at 1128–29). See also *Stratton v. Handy Button Machine Co.,* 639 F.Supp. 425, 432–33 (N.D.Ill.1986), in which this Court similarly held a plant manager's statements (1) he was putting a "younger man" into plaintiff's job and (2) plaintiff should "go to EEOC for age discrimination" barred summary judgment.

Unfortunately for Zick, his situation differs from that of Stumph, Rizzo and Stratton in two important ways:

1. Ward was Verson's Treasurer. Unlike the speakers in each of *Stumph, Rizzo* and *Stratton,* he had neither (a) any direct or indirect supervisory role vis-a-vis Zick nor (b) any input into, or final authority over, the termination decision. That total noninvolvement makes his asserted statement "not probative" of Smith's motivation. Accord, *La Montagne,* 750 F.2d at 1412 (dealing with a directly parallel fact situation in a judgment n.o.v. context); *Oxman v. WLS–TV,* 641 F.Supp. 652, 653–655 (N.D.Ill. 1986) (same in a summary-judgment context).[13]

2. Even more fundamentally, Ward's statement cannot carry the evidentiary freight Zick consigns to it. Nothing about Ward's statement suggests he actually knew why Zick was laid off. Zick says Ward told him "that's the way it generally happens, you get rid of the older guys with the benefits." But what "generally happens" is not at issue here. Ward's statement addresses neither Zick's termination nor Verson's entire July 1984 layoff-consolidation effort. That statement is just not "relevant evidence" (see Fed.R.Evid. 401), and by definition an irrelevant statement cannot create a genuine issue of material fact.[14] In short, Zick loses on the first branch of his claim—the asserted "direct evidence" branch.

*Inferential Evidence of Discrimination*

As Verson Mem. 9 points out, it had seven RMMs in July 1984, aged 51, 55, 56, 57, 58, 59 and 60. By definition anyone laid off from that group would have been in the ADEA–protected class. Verson did not wipe the slate clean and bring in younger RMMs: After the layoffs it had four RMMs, aged 55, 56, 58 and 59. That evidence in itself leaves no room for an inference that there was a youth movement afoot.

However Zick says focusing only on the RMM group is myopic in three ways. They need no more than brief discussion.

First, Zick Mem. 1 urges Verson laid off several other over–50 employees along with him, while retaining younger ones. Verson points out two employees in their 20s were laid off at the same time (B. Judnic and C. Rakowski). That sort of seat-of-the-pants pseudo-statistical evidence is worthless unless we are told who was *not* fired in preference to those fired. Merely saying

---

**13.** It is always worth noting corporations do not act by themselves: They must perforce act through individual agents charged with particular responsibilities. In employment matters Ward did not in the least act for Verson. Smith did. Hence "Verson's" motivation must really be equated with Smith's motivation—and not with Ward's surmise.

**14.** Verson's deposition characterization of Ward's statements fares even worse in evidentiary terms. Verson said only there was a "rumor" that "the company was trying to cut overhead with older people" and "Ward sort of suggested that could have been it."

six of eight employees terminated were over 40 [15] makes too much of a very small statistical sample and (*Parker v. Federal National Mortgage Association*, 567 F.Supp. 265, 271 (N.D.Ill.1983), *aff'd*, 741 F.2d 975 (7th Cir.1984)):

> lumps together [Verson's] employees regardless of the different divisions to which they were assigned, and so [Zick] is just not responsive to [Verson's] account of its particular problems....

Second, Zick Aff. ¶ 11 does say at least three younger salesmen were not laid off, and he "was fully capable of performing their jobs." As it happens, Farnesi 2d Aff. ¶ 2 points out two of those salesmen (Gerald Barich, age 50, and Tom Van Ness, age 54) were not so young as Zick thought. But in any case Zick is simply wrong in arguing Verson was required to fire a younger employee holding any job for which Zick was qualified. That is neither a substantive ADEA requirement nor evidence of a pretext (*Sahadi v. Reynolds Chemical*, 636 F.2d 1116, 1118 (6th Cir. 1980)). ADEA is not a guaranty of continued employment to those over 40. It merely prohibits employers from using age as a factor to disadvantage employees in the protected class. Presumably Zick was qualified to do many jobs at Verson—any unskilled job, for example. But the fact an employer fails to find some way of retaining an older employee, even at the expense of firing a younger one, is not evidence of a discriminatory motive.

Third, Zick says at least two younger employees (Kelleher and Grizzetti) were allowed to transfer in lieu of termination, a form of disparate treatment that would tend to show pretext. But upon examination Zick's "evidence" shows no substance. Kelleher was not transferred into a new job, but merely moved to a new location. No one was fired to make way for him, and no new job was created for him. It was not possible to structure a like transfer for Zick, for his job itself was eliminated. And

as to Grizzetti, though a new job was created, it was a job he was specially qualified to fill (and Zick admittedly was not) by virtue of his technical background. Further, it was a job Smith determined could be a new source of profits. Nothing Zick has said suggests Smith decided to keep Grizzetti because he was younger and then cast about for a way to use him.

\* \* \* \* \* \*

In sum, there is nothing in either Zick's direct-evidence case or his inferential case that establishes a fact question as to the existence of age-based motivation. Further, he has offered nothing to undermine the credibility of Verson's articulated nondiscriminatory reasons on their own terms—the approach taken by plaintiff in *Christie v. Foremost Insurance Co.*, 785 F.2d 584, 586–87 (7th Cir.1986), upon which Zick erroneously relies.

Zick frequently suggests Verson should have retained him because he was a productive employee. But Verson says the terminated employees' productivity was irrelevant to its decision because all were productive. Necessarily some good workers had to be let go. Zick has presented no evidence hinting he was more productive than any of those kept on in any event— and more important, no probative evidence indicating the decisions as to termination and retention were age-based.

ADEA is about age discrimination, not shabby or numbskull employment practices. Economically beset employers have hard choices to make. But absent evidence of age discrimination—of which Zick has shown none here—an employee cannot point the finger at another and say "that one should have been fired, not I."

### Conclusion

There are no genuine issues of material fact, and Verson is entitled to a judgment

---

**15.** R. Bender was 47, thus not over 50. But he was within the ADEA-protected class, so it is proper—giving Zick the benefit of favorable inferences—to put him in that group. Also included in the six is Bozich, for Verson's statement he was fired for performance reasons might itself be pretextual.

as a matter of law. This action is dismissed.

APPENDIX

It is fair to say our Court of Appeals has concurrently followed two different, not wholly parallel, tracks in its analysis of reduction-in-force prima facie cases. Recognizing the *McDonnell Douglas* formulation was not in terms applicable to such situations (because no one is hired in preference to the terminated employee), *Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1217 (7th Cir.1985) (per curiam) said (referring with approval to Fifth Circuit doctrine in such cases):

> [I]n a job reduction situation, a plaintiff can establish a prima facie case under the ADEA by: 1) showing he was within the protected age group; 2) showing he was adversely affected, either through discharge or demotion; 3) showing he was qualified to assume another position at the time of the discharge or demotion; and 4) producing circumstantial or direct evidence from which a factfinder might reasonably conclude that the employer intended to discriminate in making the employment decision at issue.

That approach differs from the one articulated only four days later in *Stumph*, 770 F.2d at 96 in two significant respects:

1. *Matthews* requires a showing plaintiff was "qualified to assume *another* position," while *Stumph* requires a showing plaintiff was "qualified for *his* position."

2. *Matthews* requires circumstantial or direct evidence of discriminatory intent, while *Stumph* makes no such requirement.

*Stumph* cites to earlier cases as establishing the law of this Circuit. It does not refer at all to the *Matthews* formulation, while *Dorsch v. L.B. Foster Co.*, 782 F.2d 1421, 1424 (7th Cir.1986) applies *Matthews* without citing *Stumph* except in a passing footnote.[1] *McNeil v. Economics Laboratory, Inc.*, 800 F.2d 111, 114 (7th Cir. 1986)—our Court of Appeals' most recent word on the subject—stated the *Stumph* principle, then applied the *Matthews* test while affirming a judgment for plaintiff. However *McNeil*, at 114 n. 1 said as to the *Matthews* evidence-of-intent requirement:

> Judge Flaum has argued persuasively that this last requirement may impose too heavy a burden upon a plaintiff. See *Matthews*, 769 F.2d at 1219–24 (Flaum, J., concurring). He argued that the plaintiff should be permitted to show instead that he or she was discharged while younger employees either were retained to perform the plaintiff's job or permitted to transfer into some other job for which the plaintiff was qualified. *Id.* at 1224.

Thus, while appearing to cast doubt on the continued vitality of the *Matthews* formula, *McNeil* used it as a worst-case test plaintiff was nevertheless able to meet. By the same token, applying the *Stumph* methodology in this case gives Zick the benefit of all possible doubts.

That much said, it should be observed the *Matthews* prima facie case departs importantly from established ADEA (and Title VII) principles. At least two things make that plain.

First, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) introduced the "prima facie case" approach to employment-discrimination litigation. Nothing in the *McDonnell Douglas* formulation required plaintiff to offer *any* "circumstantial or direct evidence" of discriminatory intent. Instead its prima-facie-case approach simply served the purpose of getting a case on its feet through an inference-drawing process. As *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) explained:

---

1. This is reminiscent of a phenomenon often encountered in dealing with Illinois Supreme Court decisions of a generation ago: two lines of coexisting—and quite inconsistent—authori-ty, neither of which acknowledges the other or cites the other cases, let alone essaying to reconcile them. That of course plays havoc with development of an orderly jurisprudence.

The method suggested in *McDonnell Douglas* for pursuing this inquiry, however, was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination. A prima facie case under *McDonnell Douglas* raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.

Indeed, that *Furnco* passage shows it is not so much the employer's acts themselves that raise the inference, but rather their "otherwise unexplained" character (*id.*):

> because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting.

But if plaintiff has actual evidence of discriminatory intent, there is no need to rely on an inference drawn from an adverse action that is "otherwise unexplained." *McDonnell Douglas'* prima-facie-case model addresses the plaintiff who needs that sort of crutch.

Thus *Matthews'* requirement of actual-intent evidence really makes no sense as a prerequisite to a prima facie case (whose purpose, after all, is merely to shift the burden of going forward because an *inference* of discrimination is fairly the result of "otherwise unexplained" acts). If a plaintiff can meet the fourth *Matthews* requirement there is no need for the other three: Issue is joined directly on the credibility of plaintiff's intent evidence as weighed against defendant's explanations. See *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1128 (N.D.Ill.1986).

Plainly *Stumph* treats with the prima facie case in *McDonnell Douglas* terms, while *Matthews* does not. True enough, there is a sense in which reduction-in-force cases can never involve "otherwise unexplained" actions, because by definition the explanation is a reduction in force. But that does not rule out the utility of an inferential prima facie case, for it is always possible (1) the asserted reduction in force was merely a cover for discrimination or (2) necessary force reductions were carried out in a discriminatory manner. By requiring evidence of discriminatory intent as part of the prima facie case, *Matthews* both (1) muddies the analytical waters and (2) gives conclusive weight to defendant's asserted nondiscriminatory reason without giving plaintiff the opportunity to show that reason is a sham—a process discussed more fully in the text.

Second, *Stumph*—like *McDonnell Douglas*—requires plaintiff to establish he or she was qualified for the job he or she held at the time of termination. *Matthews* says plaintiff must show he or she was qualified to assume another position at the time of the force reduction. By itself the "qualification" element has raised some analytical difficulties (see *Stratton v. Handy Button Machine Co.*, 639 F.Supp. 425, 430–31 (N.D.Ill.1986)). *Matthews* creates even further opacity. After all, the basis of a reduction in force is the employer's decision it needs fewer employees. Requiring plaintiff to show he or she was qualified to assume another position conjures up the prospect of requiring defendant to make room for those whose jobs have been eliminated by firing others. But as the text explains, even if plaintiff is qualified to do someone else's job, defendant is under no obligation to fire that someone else on pain of ADEA liability.

Of course disparate treatment (making a place for a young employee but not for an older one) may be evidence of discrimination. But it is not the only possible evidence, and it doesn't always exist. Thus there is no reason a plaintiff must establish at the outset he or she was qualified to assume another job unless (1) plaintiff is trying to make out a case based on that kind of disparate-treatment evidence or (2) defendant brings in plaintiff's lack of alternative qualifications as the reason for its actions.

Requiring proof of transferability (for that is the essence of *Matthews'* third element), just like requiring direct evidence of discriminatory intent, forces the inferentially-built prima facie case into a narrow pattern, shutting out potentially fruitful evidentiary approaches to an ultimate finding of discrimination. That is especially true where, as here, defendant moves for summary judgment and plaintiff is entitled to the benefit of all reasonable inferences the facts can yield.

*Stumph* may make it easy for plaintiff to establish a prima facie case—perhaps our Court of Appeals (or some members of that Court) thinks (or think) too easy. But as this opinion itself demonstrates, that does not load the dice in plaintiff's favor. Rather it merely facilitates a full, logical and orderly evaluation of all relevant evidence. *Matthews* and its progeny make that much more difficult.