Maurice HOWES, Plaintiff,

v.

ILLINOIS INSTITUTE OF TECHNOLO-
GY RESEARCH INSTITUTE,
Defendant.

No. 86 C 6617.

United States District Court,
N.D. Illinois, E.D.

May 17, 1988.

Timothy A. Bridge, Jeffrey M. Lerner, Lerner, Bridge & Reiss, Ltd., Chicago, Ill., for plaintiff.

Max C. Brittain, Jr., Marcia E. Goodman, Kovar Nelson Brittain & Sledz, Chicago, Ill., for defendant.

SHADUR, District Judge.

### Findings of Fact and Conclusions of Law

Dr. Maurice Howes ("Howes") has sued his employer Illinois Institute of Technology Research Institute ("IITRI") under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a), charging IITRI with adverse employment actions in which Howes' age was a determining factor. This Court has conducted a bench trial and has received the parties' post-trial proposed findings of fact ("Findings") and conclusions of law ("Conclusions"). In accordance with Fed.R.Civ.P. 52(a), the following Findings and Conclusions reflect the decision of this Court on the relevant issues in the case.[1]

### Findings of Fact

1. Howes was born April 4, 1930 and, in view of his age and the nature of his claim, is a "person aggrieved" within the meaning

---

1. To the extent (if any) the following Findings may be deemed conclusions of law, they shall also be considered Conclusions. To the extent (if any) matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings.

of ADEA. IITRI is a not-for-profit corporation having its principal place of business within the Northern District of Illinois at 10 West 35th Street, Chicago, Illinois 60616. IITRI is a scientific and engineering research organization and is an "employer" in an industry "affecting commerce" within the meaning and context of ADEA.

2. Robert B. Warren ("Warren") was designated the director of the Chicago Division of IITRI (the "Division") in December 1983, to take charge of the Division at the beginning of 1984. At that time the Division had been operating at a loss for several years. Warren's charge was to reverse that trend.

3. Warren notified[2] the Directors of Research (the "Directors"), who were in charge of leading the various departments within IITRI, that he would be monitoring the financial performance of their departments closely and would hold each Director responsible for producing satisfactory performance. Warren held a meeting ("by-period review") with each of the Directors during each IITRI financial business period.[3]

4. At the by-period reviews, Warren discussed with each Director the financial performance of his department to date and also discussed such matters as the promotional activities being undertaken, equipment investments being made and other actions being taken to improve the financial performance of the department.

5. Before the beginning of each fiscal year Warren met with each Director to plan a budget for that Director's department, with performance goals being set for each of the 13 Periods. Each Director would author the original budget proposal, after which the process generally involved several iterations between Warren and the Director before a final budget was reached and forwarded to IITRI's President and Board of Governors for approval.

6. During each fiscal year, Division Operating Statements were issued on a per-Period basis, showing the financial performance of each department by section (cost center), both in absolute numbers and as a comparison to the budget for that entity.

7. At the end of 1984 Warren studied the Division Operating Statements and other indications of business performance for the entire Division, to determine how the Division had performed that year and how improvements might be made for the next year. Warren determined the Division's 1984 performance was well below his expectations. Two departments' performance fell farthest from those expectations: the Materials and Processing Technology Department ("Department M"), headed by Howes, and the Chemistry and Chemical Engineering Department, headed by Demetrios Moschandreas ("Moschandreas"). Moschandreas was 41 years old, the youngest of the eight Directors, and Howes, at 54 years old, was the fourth oldest of the Directors.

8. At the beginning of 1985 Warren sent each of the Directors a notice entitled "Performance Expectations—1985." Those notices (the "Notices") had certain common elements, together with other elements tailored to the individual Directors.

9. Because of the particularly disappointing performance of their departments, both Howes and Moschandreas were notified through meetings and through the Notices that the survival of their departments was in danger. Warren's Notice to each of them contained the following language:

> The department performance for 1984 fell well below expectations. In my view, the Department Director is solely accountable for the department's performance. The financial shortfall is a

---

2. These Findings will consistently use the past tense, but only because the relevant time period was a few years ago. No inference should be drawn that any of IITRI's current procedures are different from those described in Findings 3 through 6.

3. For financial recordkeeping purposes the IITRI fiscal year (the January 1 to December 31 calendar year) is divided into 13 four-week financial periods ("Periods"). These Findings will refer to them by number (e.g., "Period 4").

cause of real concern. But that situation is compounded by a weak backlog posture. This condition severely limits our options in 1985. A repeat of this situation will not be tolerated in 1985.

You must aggressively pursue the objectives laid out in the Business Plan for 1985. You have my complete support.

None of the Notices sent to other Directors contained the same language. Instead, the other Directors received positive comments on the efforts they had put forth during 1984. However, all Notices (those to Howes and Moschandreas as well as those to the other Directors) said in part:

> The declining performance over the years has reached the point where clear evidence of its viability must be demonstrated or the Corporation will have to exercise other business options.

> \*    \*    \*    \*    \*    \*

The first seven periods in 1985 will serve as the observation window for assessing our likelihood of meeting the 1985 program objectives and proper positioning for 1986. Decisions will be made at that time.

10. To facilitate the beginning of a recovery for Department M, Howes was allocated $300,000 for investment in equipment during 1985. However, Howes chose to limit the Department's expenditures for new equipment and facilities severely, spending only minimal portions of his allocation.

11. To assist Howes in accomplishing the hoped-for recovery, Warren also held weekly meetings with Howes, approximately one hour in length, to discuss and consult on Howes' activities in managing Department M. That too was an extraordinary step.

12. Although Department M began 1985 by performing close to the expected budget, its performance gradually declined until by the end of Period 4 (in April 1985 [4]) Department M had lost some $100,000 and

was $26,000 behind budget. That decline not only continued but accelerated:

(a) By the end of Period 7 on July 14 (the mid-year "window" period specified in each of the Notices) Department M had lost almost $190,000 and was some $168,000 behind budget.

(b) By the end of Period 8 on August 9 Department M had lost some $240,000 and was $209,000 behind budget.

(c) By the end of Period 9 on September 6 Department M had lost $280,000 and was $286,000 behind budget.

(d) By the end of Period 10 on October 4 Department M had lost some $332,000 and was $362,000 behind budget.

By the end of 1985 Department M had lost $510,000 and was $517,000 behind budget. Those figures included income from all the original activities of Department M, including ceramics and those that later made up the Surface Engineering Center.

13. In contrast, by the end of Period 7 on July 14 the Chemistry Department was almost $66,000 ahead of budget and had cut its losses from the previous year dramatically. That department finished 1985 some $14,000 ahead of budget, having cut its 1984 losses by more than two-thirds, to $197,000.

14. Viewing the results in mid-August, Warren observed the financial performance of the Chemistry Department was improving, while the financial performance of Howes' Department M was declining steadily. Warren determined that, based on IIT-RI's overall financial situation, it could not at that time afford to invest a large amount of dollars in any single activity with uncertain payback. Warren further determined Department M was in such a precarious position that only a very large investment could turn the situation around, if indeed it could be turned around at all.

15. In August Warren spoke with Division Personnel Manager Ronald Seipp ("Seipp"), telling Seipp (a) he had tentatively concluded Department M was not a viable operation and (b) if it were not, it would

---

**4.** Because most of the operative events dealt with in these Findings took place during 1985, all days and months during that year will be

referred to without year designations unless required for clarity. All occurrences during other years will carry the year designation.

have to be dissolved, leaving Howes (as its Director) without a position. Warren asked Seipp whether he recommended speaking to Howes in August, to give him early warning of the possibility that Department M might be dissolved. Seipp advised Warren to have such a meeting with Howes.

16. On August 19 Warren met with Seipp and Howes and told Howes that unless Department M's financial performance improved significantly by the end of September, Department M would be dissolved. Warren told Howes that although the decision was not yet final, because of the minimal likelihood of significant improvement Warren would not consider it unreasonable if Howes were to seek out other positions of employment.

17. After that meeting Warren began to investigate whether any viable activities remained in Department M and how any nonviable activities might be wound down. In that respect, he asked Dr. Suresh Verma ("Verma"), one of the Group Leaders in the Metal Science and Technology Section of Department M, to present a plan for the existing contracts and staff in Verma's area.

18. After considering Warren's request, Verma came up with a new idea: combining certain elements of the Metal Science and Technology Section of Department M with other technical elements in the Department, carrying out two fairly large existing contracts and focusing on research into surface material phenomena as a strategy for seeking out future contracts. Verma's idea was that a shift in marketing focus might be more viable from a business point of view than the then-current approach of Department M's Metal Science Section. Under Verma's proposal, instead of the Department's seeking to develop new and improved materials, the emphasis would change to developing new and improved surface treatments that would allow existing materials to function in more desirable ways. Verma presented his idea in a meeting with Howes and Warren in late August or early September.

19. Warren suggested that Verma present his proposal in writing, and Verma did so (Joint Ex. 12). At Warren's request Verma later revised the proposal into the format of a business plan (Joint Ex. 13) (see Finding 29).

20. Verma's proposal suggested the refocused activity be renamed the Surface Engineering Center ("SEC") and went on to say (Joint Ex. 12 at 3):

> With the new name of SEC, IITRI staff would have access to most of the existing technical areas and facilities of the Metal Science and other departments, but would sound more economically oriented to outside people. This should attract major funding from DOD and other other government organizations and smaller contracts from private industry and utilities.

As that last sentence may suggest, each department and section at IITRI derives the income that provides the major portion of its operating budget from research and development contracts awarded by government or private industry.

21. In the case of the proposed SEC, the major contracts that were to form its initial basis were contracts for which Verma was the principal investigator and that were based on contract proposals authored primarily by Verma. Verma's proposal also suggested that the SEC have access to certain equipment from Department M, including the laser and squeeze testing facility, and certain facilities from the Metal Science Section, as well as certain equipment from the Chemistry and Electro-Optics Department.

22. Based on a consideration of Verma's proposal and on the poor expectations for Department M, Warren determined that the SEC provided the potential of maintaining the still-viable activities contained within Department M, while drastically cutting the losses occasioned by Department M's operation. Consistent with IITRI's financial situation at the time, Warren saw the SEC as a new venture that could be tested without large-scale capital investment or a large financial risk. It was envisioned that at the outset the SEC would have signifi-

cantly fewer employees and a significantly smaller budget than that normally maintained by departments in the Division.[5]

23. In fact, the original SEC consisted of 12 employees as compared to the 40 employees in Department M in 1985. Accordingly the SEC was designated as a cost center and was assigned to a new Department P, named the Applied Technologies Department. In late October or November Warren decided that John Granath ("Granath"), then 59 years old, would be named Director for that department.

24. During September Warren considered who should be named to lead the SEC. Due to its technical base and the scope of responsibility, Warren considered there were only two individuals who were technically competent for the position: Howes and Verma. Warren further determined that, in order to get a new business operation off the ground, the leader should have good marketing and promotional abilities as well as managerial skills.

25. Warren considered Howes was accountable for the business failure of Department M and believed Howes had failed to demonstrate the marketing and promotional abilities, as well as the proper leadership, required to maintain its viability. As a result, Warren felt Howes did not possess the combined attributes of technical background and managerial leadership, as well as promotional and marketing skills, required to lead the SEC, a position that would require both a technical background and leadership abilities.

26. Verma did not have as much managerial experience as Howes. However, Verma had been responsible for performing at a superior level in directing more junior staff in Department M's Metal Science and Technology Section. That superior performance had resulted in Verma's promotion by Howes to Senior Engineer. Accordingly Warren felt Verma would be

effectual in implementing the proposal for the SEC—a proposal Verma had originated.

27. Although Warren contemplated Verma's serving as leader of the SEC, he was expected to retain his then job title of Senior Engineer and not to become a Director (see Finding 38). When Warren proposed that arrangement and a salary of approximately $45,000 per year to Verma (that took place sometime in late September), Verma reported to Warren he had been offered a job at another corporation at a higher salary, and he asked Warren to raise his salary to $50,000. Warren refused to raise the salary, telling Verma he was willing to pay only $45,000 for the SEC leader position. Verma nevertheless accepted the assignment.

28. In late September Warren confirmed his earlier determination that a continuation of Department M would erode the performance of the Division to unacceptable levels. Warren told Seipp that, consistently with his consideration in mid-August, he had decided to terminate Howes' employment because Department M was no longer financially viable, leaving Howes without a Director's position, and because Howes bore the major responsibility for the situation and could not be entrusted with similar responsibilities. On October 2 Warren requested that Seipp confirm Howes' termination and notify Howes of the financial terms of the termination via letter. Based on the mid-August meeting, Seipp knew that Howes himself was well aware of the reasons for Warren's decision. Seipp summarized his understanding of the situation by stating in the introductory portion of his October 2 letter that Howes was terminated due to "lack of work" for him at IITRI.[6] Seipp's letter went on to say Howes' employment would continue for six months (through April 1, 1986) to afford Howes the opportunity to search for alternate employment,

---

5. Within the Division the optimum size for an operating department is defined as approximately 50 individuals, including scientists, engineers, technicians and clerical staff. Generally an operating department would have not many fewer than 30 assigned employees.

6. Seipp commonly used the term "lack of work" in such letters, even when addressing a "lack of work" for one individual.

unless Howes accepted a new position before that date.

29. On October 3 Warren sent a memo to the IITRI staff announcing the establishment of the SEC and further announcing the SEC was to be directed by Verma. On October 4 Verma submitted to Warren his business plan for the SEC (Joint Ex. 13). Figure 1 of that plan was a suggested organization chart showing (a) only one Senior Engineer position to be filled at the outset, a position allocated to Dr. S. Bhattacharyya ("Bhattacharyya"), (b) the possible addition of another Senior Engineer position at a later date and (c) four positions for Assistant Engineers, two of which were to be filled at the outset and two of which were to be held open pending the SEC's success in business development.

30. Verma had previously suggested that two Senior Engineers be hired in the SEC at the outset. However, Warren had vetoed that idea, saying Verma would also function as a Senior Engineer and Warren did not want to risk large operating losses due to unnecessary staff.

31. On November 18 it was formally announced that Department M would be dissolved, but the Department remained intact for accounting purposes through the end of the fiscal year on December 31. During the fall of 1985 many of the employees within Department M were offered transfers within IITRI, and others, anticipating that they would be left without positions, found employment outside of IITRI. Several individuals took the opportunity to retire.

32. These lists of the employees shown on the August 1985 organization chart for Department M (each list includes the employees' names in order of their dates of birth) reflect the nature of their respective departures from Department M:

(a) transferred to the SEC:[7]

| | Age at 1–86 |
| --- | --- |
| M. Dimenn | 68 |

| | Age at 1–86 |
| --- | --- |
| S. Bhattacharyya | 61 |
| M. Dineen | 60 |
| J. Dorcic | 57 |
| S. Verma | 38 |
| E. Vesely | 34 |
| W. Peterman | 33 |
| T. Todner | 33 |
| E. Navratil | 32 |
| G. Cheng | 30 |
| C. Eiholzer | 28 |

(b) transferred to Department P, but not to the SEC:

| | Age at 1–86 |
| --- | --- |
| F. Seaman | 62 |
| H. Nichols | 62 |
| M. Hernandez | 45 |
| C. Hales | 40 |

(c) transferred to Department C:

| | Age at 1–86 |
| --- | --- |
| H. Nakamura | 65 |
| Y. Harada | 54 |
| M. Rhein | 47 |
| V. Humphreys | 40 |
| R. Mell | 33 |

(d) transferred to other departments within IITRI:

| | Age at 1–86 |
| --- | --- |
| V. Johnson | 48 |
| R. Suchanek | 44 |
| J. Mok | 34 |
| G. Jeka | 30 |
| D. Victor | 27 |

(e) notified of termination due to lack of work:[8]

| | Age at 1–86 |
| --- | --- |
| M. Howes | 55 |
| S. Meletis | 33 |

(f) resigned from Department M, primarily due to the lack of opportunity in the ceramics area at IITRI:

| | Age at 1–86 |
| --- | --- |
| D. Larsen | 43 |
| R. Dwivedi | 31 |
| J. Adams | 30 |
| R. Diesslin | 29 |
| S. Moran | 28 |
| S. Stuchly | 25 |

33. Of the nine individuals older than Howes listed as employees of Department M on the August 1985 organizational chart,

---

7. Howes (age 55 at January 1986) was also ultimately transferred to the SEC, though Finding 32(e) lists him as having been notified of his termination (See Finding 28). Finding 36 explains the circumstances of his later transfer.

8. In each instance IITRI's Human Resources Department notified the employee of such termination.

six were transferred to other positions within IITRI and two chose to retire voluntarily, one after initially accepting a transfer to another position within IITRI. Only one individual older than Howes, Seymour Bortz ("Bortz"), complains he was displaced involuntarily. However, Bortz himself was actually employed for some nine months (through August 1986) after the dissolution of Department M was announced, and he received two-thirds of his salary thereafter until he became eligible for retirement.

34. None of the individuals employed in the Ceramics Section of Department M in August was transferred to the SEC, while approximately half of the individuals in the Metal Science and Technology and the Metal Working Section of Department M were transferred to the SEC.

35. On the November/December job posting list[9] the SEC posted a position at the Assistant/Associate Engineer level for an individual with a B.S., M.S. or Ph.D. in Metallurgy or Material Science and 0–3 years of experience. That job was for an individual who would be added to the SEC staff of individuals transferred from Department M. When IITRI learned Howes was not having success in his job search and he might consider a position at IITRI at a position less senior than his original Director of Research position, the Human Resources Department suggested that Howes apply for the job.

36. In December IITRI was informed that Bhattacharyya would resign from his position as Senior Engineer in the SEC. That created a newly available Senior Engineer position within the SEC's approved table of organization, and it was decided to offer that position to Howes. That offer was made by letter from Lucy Amft dated January 3, 1986, which stated that if Howes accepted the offer Seipp's October 2 termination letter would be rescinded. Howes accepted the offer and began work as a Senior Engineer on January 20, 1986.

Howes' salary in that position was $3,750 per month ($45,000 per year), and the position did not carry Class I benefits.

37. Since January 1986 Howes has performed the duties of a Senior Engineer.

38. "Director of Research" is a job title at IITRI associated with a certain salary range and certain benefits, as are the Science Advisor and Senior Engineer positions. Most Directors are assigned to perform the duties of directing one of the departments within IITRI. Although the leader or head of a cost center activity may also be called a "Center Director", the leader does not by virtue of those job duties become a Director of Research. In fact, the level of responsibility expected of a Center Director is much less than that demanded of a Director of Research.

39. As the ensuing Findings reflect, the evidence shows no trend of the Division's eliminating older employees from their positions in favor of younger individuals. Indeed, all the individuals holding Director positions at the Division are over 40, and many are older than Howes.

40. When IITRI's 1981–85 Five–Year Plan was produced, Warren did not occupy a position that made him privy to that plan, and he did not in fact see the plan until after this litigation was commenced. Warren was not aware of, nor was he influenced by any statements in the personnel sections of, either the 1981–85 Five–Year Plan or the 1985 Annual Plan in his actions with respect to either Howes or Department M. Nor did Warren hold the opinion that the management staff members in the Division were too old or too highly paid.

41. In January of each year, beginning with January 1984 when Warren became Director of the Division,[10] the ages of the Directors in the Division were as follows, listed in descending order of age (in each of the first two years Howes' age is underlined, while in each of the last two years Howes' age—if he were to be included in

9. This was the method followed at IITRI to indicate the availability of jobs in any of its units.

10. In this instance, of course, when referring to Warren the term "Director" is not used as a defined term of art meaning "Director of Research."

the list—would place him as the fifth oldest of the eight individuals):

| 1984 | 1985 | 1986 | 1987 |
|------|------|------|------|
| 59 | 60 | 61 | 62 |
| 55 | 56 | 59 | 58 |
| 53 | 55 | 57 | 58 |
| 48 | 54 | 56 | 57 |
| 45 | 46 | 47 | 48 |
| 43 | 44 | 45 | 46 |
| 41 | 42 | 42 | 43 |
| 40 | 41 | | |

42. During 1984 Warren created two new Departments, Explosion Science and Computer Systems and Applications, naming Hyla Napadensky (age 55) and J. Cook (age 42) as their respective Directors. During 1985 Warren eliminated the Computer Systems Department and the Materials Department and created the Applied Technologies Department, naming Granath (age 59) to be its Director. During 1986 Warren created the Manufacturing Department, naming Keith McKee (age 58) to be its Director.

43. From 1981 to 1987 the proportion of senior staff (including upper management and senior technical staff to Senior Engineer level) in the Division who were over 40 increased from 80.3% to 84.5%. Similarly, in 1981 (when Howes was 51) some 46.7% of the senior staff in the Division were age 51 or older, while by 1985 and 1986 (the years in which the actions at issue in his lawsuit took place) the proportion of senior staff in the Division who were Howes' age (55-56) or older had increased to 47.8% and 47.5% respectively.

44. From 1981 to 1987 the number of senior staff people in the Division was cut by approximately one-third, from 122 to 84. At the same time the age level of the senior staff rose significantly.

45. At the time Howes was notified of his termination IITRI was well aware of ADEA's proscriptions. Its personnel department investigated the circumstances of his proposed termination before it took ef-

fect and concluded in good faith that no violation of ADEA was threatened.

### Conclusions of Law

1. This Court has jurisdiction under 29 U.S.C. § 626(c)(1) and 28 U.S.C. § 1331. It is undisputed that (a) Howes is a "person aggrieved" for ADEA purposes, (b) IITRI is an employer subject to ADEA and (c) Howes has satisfied both (1) the administrative preconditions to suit under ADEA and (2) all conditions imposed by the statute on private ADEA enforcement actions.

2. To show a violation of ADEA, Howes must prove age was a determining factor in his proposed discharge or his demotion or both (*Bechold v. IGW Systems, Inc.*, 817 F.2d 1282, 1284 (7th Cir.1987)). For that purpose Howes must prove he would not have been notified of his proposed discharge, nor would he have been demoted, "but for" IITRI's intent to discriminate against him because of his age (*Oxman v. WLS-TV*, 846 F.2d 448, 452, (7th Cir.1988) ("The plaintiff need not prove that age was the sole factor motivating the employer's decision, only that age was a determining factor in the sense that he would not have been fired but for the employer's motive to discriminate on the basis of age")).

3. In the past our Court of Appeals has adopted two similar, but distinct, approaches to the concept of a prima facie case in ADEA actions, such as this one, involving reductions in force (*Zick v. Verson Allsteel Press Co.*, 644 F.Supp. 906, 910 n. 8, 914–16 (N.D.Ill.1986), *aff'd*, 819 F.2d 1143 (7th Cir.1987)). That distinction in approach has now been eliminated by *Oxman*, the newly-decided case that has overruled *Matthews v. Allis-Chalmers*, 769 F.2d 1215 (7th Cir.1985) (per curiam)— see 846 F.2d at 455–56.[11] In any event, any such difference in approach becomes irrele-

11. In *Zick*, 644 F.Supp. at 910 n. 8 this Court had opted against applying the *Matthews* approach (that and the other alternative were discussed in the *Zick* Appendix, *id.* at 914–16). That was not at all a matter of prescience. Instead it was done both (1) because this Court viewed *Matthews* as less sound in analytical terms and (2) the other path was more conservative (that is, if the employer prevailed under that approach, it would do so a fortiori under *Matthews*).

vant when a discrimination case such as this one has gone to trial, as just reconfirmed in *Washington v. Electrical Joint Apprenticeship and Training Committee of Northern Indiana,* 845 F.2d 710, 713–714 (citations omitted):

> There is much unnecessary talk in the briefs about the prima facie case. When a discrimination suit is tried, as it was here, the question whether the plaintiff made out a prima facie case falls out of the picture, ... and the relevant question is whether the plaintiff proved discrimination.

■ 4. Howes could have satisfied his burden of proof by presenting either direct or indirect evidence of discrimination (*Oxman,* 846 F.2d at 452). There is no direct evidence to prove IITRI discriminated against Howes because of his age, so Howes must rely on indirect—on circumstantial—evidence. In any event, the ultimate burden of persuasion as to discriminatory intent has remained with Howes at all times (*Bechold,* 817 F.2d at 1285).

■ 5. Irrespective of whether Howes' case is viewed in terms of (a) his failure to prove he was qualified for the position he was holding or the one that became available when Department M was dismantled and the SEC was formed instead or (b) his having established a prima facie case of such qualification but his having failed to prove any pretext in IITRI's stated reasons for his proposed discharge and then the later offer of a subordinate position in the SEC (see the discussion of these alternative approaches in *Stratton v. Handy Button Machine Co.,* 639 F.Supp. 425, 430–31 (N.D.Ill.1986)), the result is the same:

Howes has utterly failed even to approach satisfying his burden of persuasion.[12] Howes has not shown his age was a determining factor in his proposed discharge or in IITRI's later decision to offer him the lower-ranking job he then accepted, because IITRI would have discharged or demoted Howes regardless of his age, based upon:

(a) the elimination of Howes' position due to IITRI's legitimate business decision to dismantle Department M;

(b) Howes' major failure to meet IITRI's legitimate expectations as Director of Department M; and

(c) Howes' serious lack of managerial qualifications to head the SEC.

6. In sum, IITRI's adverse employment decisions affecting Howes were based on totally legitimate business considerations having no relationship whatever to Howes' age. Those decisions would have been identical had Howes been 39 years of age and possessed of the same qualifications (and the same lack of critical qualifications) that he possessed and that he had demonstrated at the time IITRI took its actions.

\* \* \*

Howes has failed on the merits. This action is dismissed with prejudice.

---

**12.** This alternative set of assumptions is really posed arguendo. Based on all the evidence, this Court has concluded Howes, though a highly skilled and valuable employee in terms of his technical proficiency in the engineering field (most particularly in his areas of specialty), was regrettably entirely deficient in the managerial skills that IITRI reasonably required to head up either Department M or the SEC. Hence alternative (b) is totally hypothetical rather than being based on the evidence in the record—and that conclusion is not even a close call.